*Before the*
## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

...

| | |
|---|---|
| Benton Institute for Broadband & Society,  ) | |
|     Petitioner,  ) | |
| )  | |
|   v.  ) | |
| )  | Case No. 24-1015 |
| Federal Communications Commission  ) | |
| and the  ) | |
| United States of America,  ) | |
|     Respondents.  ) | |

## PETITION FOR REVIEW

Pursuant to 47 U.S.C. §402(a), 28 U.S.C. §§2342(1) and 2344, and Rule

15(a) of the Federal Rules of Appellate Procedure, the Benton Institute for

Broadband & Society ("Benton") hereby seeks review of the attached Order of the

Federal Communications Commission ("FCC" or "Commission"), *Implementing the*

*Infrastructure Investment and Jobs Act: Prevention and Elimination of Digital*

*Discrimination*, Report and Order and Further Notice of Proposed Rulemaking, GN

Docket 22-69 (released November 20, 2923)("the *Order*").

On January 22, 2924, the *Order* was published in the Federal Register at 89

Fed. Reg. 4128 (January 28, 2024).  A copy of the *Order* is attached as Exhibit A to

this Petition.

Venue in this Court is proper under 28 USC §2343.  This petition is timely

because it is being filed within the 60 day deadline established in 28 USC §2344.

Benton participated in the proceeding below and is aggrieved by the challenged *Order*.  It seeks review on the grounds that portions of the *Order* are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.  This includes, but is not limited to, the agency's failure to adopt a formal complaint process and its treatment of providers which are recipients of funds under the Broadband Equity Access and Deployment Program adopted pursuant to Section 60104 of the Intrastructure Investment and Jobs Act of 2021, P.L. 117-58.

Benton respectfully requests that the Court hold the contested portions of the *Order* unlawful and vacate, enjoin and set aside those provisions of the *Order* and grant all such further relief as may be just and proper.

Respectfully submitted,

/s/ Andrew Jay Schwartzman

Andrew Jay Schwartzman
525 Ninth Street, NW
Seventh Floor
Washington, DC 20004
(202) 241-2408
AndySchwartzman@gmail.com

January 30, 2024

## CORPORATE DISCLOSURE STATEMENT

Pursuant to the United States Court of Appeals for the District of Columbia Rule 26.1 and Federal Rule of Appellate Procedure 26.1, the Benton Institute for Broadband & Society (Benton) respectfully states that it is a non-profit organization with no parent companies, subsidiaries or affiliates and that none of them have issued shares to the public.

Benton is an operating foundation.  Its goal is to bring open, affordable, high-performance broadband to all people in the U.S. to ensure a thriving democracy.

Respectfully submitted,

/s/ Andrew Jay Schwartzman

Andrew Jay Schwartzman
525 Ninth Street, NW
Seventh Floor
Washington, DC 20004
(202) 241-2408
AndySchwartzman@gmail.com

January 30, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of January, 2024, I electronically filed the

foregoing Petition for Review with the Clerk of the Court for the United States

Court of Appeals for the District of Columbia Circuit using the Court's appellate

CM/ECF system.  I further certify that service was accomplished on all participants

in the case via the Court's CM/ECF system.

I further certify that I have served the following by email:

P. Michele Ellison
General Counsel
Federal Communications Commission
Washington, DC 20554
FCCLitigation@fcc.gov

I further certify that I have served the following by US mail, postage prepaid:

Hon. Merrick Garland
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Respectfully submitted,

/s/ Andrew Jay Schwartzman

525 Ninth Street, NW
Seventh Floor
Washington, DC 20004
(202) 241-2408
AndySchwartzman@gmail.com

# EXHIBIT A

## FEDERAL COMMUNICATIONS COMMISSION

**47 CFR Parts 0, 1, and 16**

**[GN Docket No. 22–69; FCC 23–100; FR ID 190877]**

### The Infrastructure Investment and Jobs Act: Prevention and Elimination of Digital Discrimination

**AGENCY:** Federal Communications Commission.

**ACTION:** Final rule.

**SUMMARY:** In this document, the Federal Communications Commission (Commission) adopts rules pursuant to section 60506 of the Infrastructure Investment and Jobs Act (Infrastructure Act) that establish a framework to facilitate equal access to broadband internet access service by preventing digital discrimination of access. These rules address policies and practices that impede equal access to broadband, while taking into account issues of technical and economic feasibility that pose serious challenges to full achievement of the equal access objective. The rules constitute an effective, balanced means to accomplish Congress's objective of ensuring that historically unserved and underserved communities throughout the Nation have equal opportunity to receive high-speed broadband service comparable to that received by others, without discrimination as to the terms and conditions on which that service is received.

**DATES:** Effective March 22, 2024, except for the amendment to 47 CFR 1.717 (amendatory instruction 5), which is delayed indefinitely. FCC will publish a document in the **Federal Register** announcing the effective date for the amendment to 47 CFR 1.717.

**FOR FURTHER INFORMATION CONTACT:** Wireline Competition Bureau, Competition Policy Division, Aurélie Mathieu, at (202) 418–2194, *Aurelie.Mathieu@fcc.gov.* For additional information concerning the Paperwork Reduction Act information collection requirements contained in this document, send an email to *PRA@fcc.gov* or contact Nicole Ongele, *Nicole.Ongele@fcc.gov.*

**SUPPLEMENTARY INFORMATION:** This is a summary of the Commission's Report and Order (*Report and Order*) in GN Docket No. 22–69, FCC 23–100, adopted on November 15, 2023, and released on November 20, 2023. The full text of this document is available for download at *https://docs.fcc.gov/public/attachments/FCC-23-100A1.pdf.* To

request materials in accessible formats for people with disabilities (e.g., braille, large print, electronic files, audio format, etc.), send an email to *FCC504@fcc.gov* or call the Consumer & Governmental Affairs Bureau at (202) 418–0530 (voice), or (202) 418–0432 (TTY).

### Final Paperwork Reduction Act of 1995 Analysis

This document may contain new or modified information collection requirements subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104–13. This document will be submitted to the Office of Management and Budget (OMB) for review under section 3507(d) of the PRA. OMB, the general public, and other Federal agencies will be invited to comment on the new or modified information collection requirements contained in this proceeding.

### Congressional Review Act

The Commission sent a copy of the *Report and Order* to Congress and the Government Accountability Office pursuant to the Congressional Review Act, *see* 5 U.S.C. 801(a)(1)(A).

### Synopsis

1. In this *Report and Order,* we adopt rules pursuant to section 60506 of the Infrastructure Act that establish a framework to facilitate equal access to broadband internet access service by preventing digital discrimination of access. The Infrastructure Act defines "broadband internet access service" for section 60506 and the remainder of Title V as having "the meaning given the term in § 8.1(b) of [the Commission's rules], or any successor regulation." Infrastructure Act 60501(1); 47 CFR 8.1(b) (defining broadband internet access service as "a mass-market retail service by wire or radio that provides the capability to transmit data to and receive data from all or substantially all internet endpoints, including any capabilities that are incidental to and enable the operation of the communications service, but excluding dial-up internet access service. This term also encompasses any service that the Commission finds to be providing a functional equivalent of the service described in the previous sentence or that is used to evade the protections set forth in this part."). In this *Report and Order,* we use the terms "broadband," "broadband service," and "broadband internet access service" interchangeably. These rules address policies and practices that impede equal access to broadband, while taking into account issues of technical and

economic feasibility that pose serious challenges to full achievement of the equal access objective. The rules we adopt today constitute an effective, balanced means to accomplish Congress's objective of ensuring that historically unserved and underserved communities throughout the Nation have equal opportunity to receive high-speed broadband service comparable to that received by others, without discrimination as to the terms and conditions on which that service is received.

2. The actions taken today are summarized below. Digital Discrimination of Access Defined. In furtherance of our goal to facilitate equal access to broadband internet access service, we adopt the following definition of "digital discrimination of access": "policies or practices, not justified by genuine issues of technical or economic feasibility, that differentially impact consumers' access to broadband internet access service based on their income level, race, ethnicity, color, religion or national origin, or are intended to have such differential impact." Under the rules we adopt today, we will investigate conduct alleged to be motivated by discriminatory intent, as well as conduct alleged to have discriminatory effect, based on income level, race, ethnicity, color, religion, or national origin. Consistent with the definition of "equal access" in the statute, we find that differentiation as to any available quality of service metric for broadband service may provide a basis for liability under these rules, absent sufficient justification.

3. Technical and Economic Feasibility. Consistent with Congress's directive, our definition of digital discrimination of access fully takes into account "issues of technical and economic feasibility," constituting impediments to full achievement of the equal access goal of the statute. We define "technically feasible" to mean "reasonably achievable as evidenced by prior success by covered entities under similar circumstances or demonstrated technological advances clearly indicating that the policy or practice in question may reasonably be adopted, implemented, and utilized." We similarly define "economically feasible" to mean "reasonably achievable as evidenced by prior success by covered entities under similar circumstances or demonstrated new economic conditions clearly indicating that the policy or practice in question may reasonably be adopted, implemented, and utilized."

4. Consumers Afforded Protection from Digital Discrimination, and

Entities and Services that are Subject to the Prohibition Against Digital Discrimination of Access. We adopt rules focusing on whether policies and practices differentially impact consumers' access to broadband internet access service or are intended to do so. In this vein, we specify that "consumer" means current and prospective subscribers to broadband internet access service, including individuals, groups of individuals, organizations, and groups of organizations. Moreover, the scope of the rules we adopt today extends not only to providers of broadband internet access service, but also to entities that facilitate and otherwise affect consumer access to broadband internet access service.

5. We adopt today the same definition of "broadband internet access service" that appears in our rules at 47 CFR 8.1(b). In accordance with section 60506, the rules we adopt today shall apply to all policies and practices that affect a consumer's ability to have equal access to broadband internet access service, including but not limited to deployment, network upgrades, and maintenance. Covered elements of service include both technical and non-technical elements of service that may affect a consumer's ability to receive and effectively utilize the service.

6. Enforcement. We adopt rules that allow for enforcement of our prohibition against digital discrimination of access through self-initiated Commission investigations and revise our informal complaint process to accept complaints alleging digital discrimination of access, including offering parties voluntary mediation overseen by Commission staff when appropriate. Possible violations will be investigated by Commission staff using our standard investigative toolkit, and all penalties and remedies will be available when we determine that our rules have been violated. The Commission will consider utilizing consent decrees when appropriate. We decline, at this time, to create an additional process for the filing and adjudication of formal complaints akin to section 208 of the Communications Act.

7. Consumer Complaints. Consistent with Congress's directive, we revise our informal consumer complaint process to accept complaints from consumers or other members of the public that relate to digital discrimination of access by establishing a dedicated pathway for digital discrimination of access complaints including from organizations, and collecting voluntary demographic information from complainants.

8. State and Local Model Policies and Best Practices. We adopt the Communications Equity and Diversity Council's recommendations that propose model policies and practices for states and localities to address digital discrimination of access. We emphasize that these model policies and practices do not foreclose adoption by states and localities of additional measures to ensure equal access to broadband service in their communities.

**Background**

9. Section 60506 of Division F, Title V of the Infrastructure Act is entitled "Digital Discrimination." This provision supports extensive broadband expansion programs in the Infrastructure Act and requires that the Commission adopt rules to facilitate equal access to broadband internet service. Section 60506(b) reads: "Not later than 2 years after November 15, 2021, the Commission shall adopt final rules to facilitate equal access to broadband internet access service, taking into account the issues of technical and economic feasibility presented by that objective, including— (1) preventing digital discrimination of access based on income level, race, ethnicity, color, religion, or national origin; and (2) identifying necessary steps for the Commission to take to eliminate discrimination described in paragraph (1)."

10. The Commission's implementation of section 60506 builds on a robust history of Commission regulatory action premised on nondiscrimination and universal service, which, in turn, furthers the goal of broadband internet access for all and addresses the digital divide.

*Commission's Efforts To Further Consumer Access to Broadband Internet Service*

11. At the core of the Commission's commitment to broadband internet access for all is section 1 of the Communications Act of 1934, as amended, which states the agency's purpose "to make available, so far as possible," a "rapid, efficient, Nation-wide" wire and radio communication service with adequate facilities "to all people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex." Nondiscrimination and universal service are cornerstone principles and drive agency policies to achieve the broadest possible consumer access to communications services. In the Telecommunications Act of 1996 (1996 Act), Congress expanded the traditional goal of universal service to include

increased access to telecommunications and advanced services, such as broadband internet access service, for all consumers at just, reasonable, and affordable rates. The 1996 Act established principles for universal service that focus on increasing access for consumers living in rural and insular areas, and for low-income consumers. Section 706 of the 1996 Act requires the Commission to report annually on whether broadband "is being deployed to all Americans in a reasonable and timely fashion."

12. In 2009, Congress directed the Commission to develop a National Broadband Plan to ensure every American has "access to broadband capability." The Commission released the National Broadband Plan in March 2010, highlighting ways to "[r]eform current universal service mechanisms to support deployment of broadband and voice in high-cost areas; and ensure that low-income Americans can afford broadband; and in addition, support efforts to boost adoption and utilization."

13. The Commission has long used its Universal Service funding programs to further consumer access to broadband and bridge the digital divide. These funding programs, which preceded the Infrastructure Act, have historically helped to deliver broadband services to low-income consumers and to unserved and underserved communities in rural and insular areas. Further, these programs provide support in various ways, including: offering to low-income consumers discounts on voice service and/or broadband internet access service; providing funding to eligible schools and libraries for affordable broadband services to help connect students and members of local communities; providing funding for health care providers to ensure that patients have access to broadband enabled healthcare services; and offering subsidies to providers to build out, deploy, and maintain networks that provide voice and broadband service in high-cost areas.

14. These Commission actions help to ameliorate a digital divide that has underpinnings in the country's historical segregation and reclining practices in housing. Relying on historical research, data, and surveys, numerous commenters correlate inequities in broadband access to historically segregated housing patterns and discriminatory housing practices. The record in this proceeding reflects that the digital divide significantly tracks housing redlining that came into existence under the National Housing Act of 1934, when the Federal Housing

Administration directed the Home Owners' Loan Corporation to create "residential security maps." These federally created maps outlined as "high-risk" those areas highly populated by minorities. Banks used these maps to deny mortgage capital to minority residents living in those high-risk areas, leading to disinvestment in these communities. Against this historical and demographic backdrop, researchers have long found that metropolitan areas with a history of redlining "generally remain more segregated and more economically disadvantaged, [and] . . . have lower median household income, lower home values, older housing stock, and rents which are lower in absolute terms (but often higher as a percentage of income)." This history has carried forward to broadband access, as researchers have found that access to broadband in the home can decrease in tandem with historical residential risk classifications, and such differences in broadband access vary depending on income levels, race, and ethnicity.

*Consumer Access to Broadband*

15. The Commission regularly reports on the number of Americans who lack access to broadband internet access service. While the Commission reported in 2021 that 14.5 million Americans lack access to broadband, an independent study suggested that the actual number was as high as 42 million. Further, Microsoft's data usage, as of 2020, suggested that as many as 120.4 million people in the United States did not use the internet at broadband speeds of 25/3 Mbps.

16. The uncomfortable reality is that too many households in the United States lack equal access to broadband. Lack of equal access to broadband is not limited to historically redlined urban communities, but also encompasses and acutely affects both rural and urban low-income communities, other rural communities, and Tribal areas.

*The Global COVID–19 Pandemic Heightened the Inequities in Broadband Internet Access*

17. The global COVID–19 pandemic compounded the problem of unequal access to broadband internet access service in the United States. The digital divide became more stark as shutdowns caused a heightened need for high-quality broadband internet access service to meet basic needs such as working from home, distance learning, accessing public benefits and services, telehealth, job-hunting, remote worship activities, remote family and social connections, and other daily activities.

In 2020, a Pew Research Center survey found that nearly half of adults surveyed stated that internet access was essential during the pandemic. And in that same survey, Pew found that at that time, "[s]ome 43% of lower-income parents with children whose schools shut down say it is very or somewhat likely their children will have to do schoolwork on their cellphones; 40% report the same likelihood of their child having to use public Wi-Fi to finish schoolwork because there is not a reliable internet connection at home." Subsequently, in 2021, Pew surveys found that 57% of households making less than $30,000 had home broadband, compared to 93% of households making $100,000 or more, and additionally, white survey participants were more likely than black and Hispanic survey participants to report having home broadband access.

18. Moreover, based on data contributed by civil society organizations, educational institutions, and private sector companies, among households with broadband access, lower-income communities were observed to have slower effective speeds. For example, broadband internet access service has been found to be 21% lower in Tribal areas, compared to neighboring non-Tribal areas, and download speeds were lower. Overall, research and data indicate that during the pandemic, entrenched disparities in broadband internet access service in low-income, rural, and minority households adversely affected all aspects of daily life, including accessing education, seeking housing and employment online, accessing telehealth medical care, and applying for services. For example, as the pandemic caused the vast majority of K–12 students across the country to receive online instruction, 14% of parents had to access public Wi-Fi because there was no reliable connection to the home. This figure was 4% in high-income households and 23% in lower income households.

*Infrastructure Investment and Jobs Act of 2021*

19. On November 15, 2021, in the midst of the pandemic, Congress enacted the Infrastructure Act providing $65 billion for broadband programs for the purpose of expanding access and affordability to under-served and unserved areas and addressing the "digital divide." During House debates on the Infrastructure Act, House Majority Whip James Clyburn (D–SC) testified about the harm caused by the digital divide and the need to address inequities in access to high-speed

broadband internet service. Division F of the Infrastructure Act is entitled "Broadband." In the legislation, Congress found: (1) Access to affordable, reliable, high-speed broadband is essential to full participation in modern life in the United States; (2) The persistent "digital divide" in the United States is a barrier to the economic competitiveness of the United States and equitable distribution of essential public services, including health care and education; (3) The digital divide disproportionately affects communities of color, lower-income areas, and rural areas, and the benefits of broadband should be broadly enjoyed by all; and (4) In many communities across the country, increased competition among broadband providers has the potential to offer consumers more affordable, high quality options for broadband service.

20. The 2019 novel coronavirus pandemic has underscored the critical importance of affordable, high speed broadband for individuals, families, and communities to be able to work, learn, and connect remotely while supporting social distancing.

*The Infrastructure Act's Funding Measures Promote Equal Access*

21. The Infrastructure Act's funding measures are intended to promote access to broadband internet access service and reduce the digital divide. Under Title I through Title V of Division F of the Act, Congress authorized funding for expansive broadband access, affordability, and digital literacy programs. These programs fall into seven major program areas: the Broadband Equity, Access, and Deployment Program ($42.45 billion), the Affordable Connectivity Program ($14.2 billion) Digital Equity Planning, Capacity and Competitive Grants ($2.75 billion), the Tribal Broadband Connectivity Program ($2 billion), Rural Utilities Service at the Department of Agriculture ($2 billion), the Middle Mile Grant Program ($1 billion), and Private Activity Bonds (approximately $600 million).

*The Infrastructure Act Requires That the Commission Undertake Specific Measures To Support the Goal of Equal Access*

22. In addition to providing funding for broadband deployment in unserved and underserved communities, the Infrastructure Act sets out specified measures for the Commission in service of the goal that "every American ha[ve] access to reliable high-speed internet." Title I directs the Commission to create a broadband funding map, which is an "online mapping tool to provide a

locations overview of the overall geographic footprint of each broadband infrastructure deployment project funding by the Federal Government." Through this map, and the National Broadband Map, the Commission and other governmental and non-governmental stakeholders can track broadband deployment projects to ensure that broadband is deployed in historically unserved and underserved areas. Title V, entitled "Broadband Affordability," addresses affordability of broadband internet for low-income consumers. In addition to expanding funding to offset the cost of broadband internet for low-income households through the Affordable Connectivity Program (ACP), Title V promotes transparency by requiring the Commission to adopt rules for broadband providers to display easy-to-understand labels that allow consumers to comparison shop for broadband services. This promotes competition by providing consumers clear, concise, and accurate information about broadband internet prices and fees, performance, and network practices.

23. Most relevant here, section 60506 of the Infrastructure Act sets out further measures to support the fundamental objective of ensuring equal access to broadband. The Statement of Policy provides that "insofar as technically and economically feasible" the Commission "should take steps to ensure that all people of the United States benefit from equal access to broadband internet access service." In addition to mandating the adoption of rules to facilitate equal access by "preventing digital discrimination of access" on specified bases and identifying necessary steps to eliminate such discrimination, matters we discuss in great depth throughout this *Report and Order*, section 60506 requires the Commission and the Attorney General to "ensure that Federal policies promote equal access to robust broadband internet access service by prohibiting deployment discrimination" on specified bases. The Commission must also "develop model policies and best practices that can be adopted by States and localities to ensure that broadband internet access service providers do not engage in digital discrimination," and revise its "public complaint process to accept complaints from consumers or other members of the public that relate to digital discrimination."

*Commission's Actions To Further Promote Equal Access*

Commission Funding Programs

24. The Commission's most recent efforts to get marginalized communities connected to high-quality broadband internet access service include administration of well-targeted subsidy programs. The Affordable Connectivity Program and its predecessor, the Emergency Broadband Benefit (EBB) Program, have been instrumental in helping low-income households afford broadband internet. Under the program, eligible low-income households can receive a discount of $30 per month toward internet service and up to $75 per month for eligible households on qualifying Tribal lands. Eligible households can also receive a one-time discount of up to $100 to purchase a laptop, desktop computer, or tablet from participating providers. As of August 2023, more than 20 million households in the United States have enrolled in the program.

25. During the pandemic, the Commission expedited adoption of the Emergency Connectivity Fund (ECF) and COVID–19 Telehealth Programs to provide funding to eligible schools and libraries for broadband services and connected devices for use by students, school staff, or library patrons and health care providers for telecommunications services, information services, and connected devices.

Communications Equity and Diversity Council

26. On June 29, 2021, the Commission chartered the Communications Equity and Diversity Council (CEDC), a federal advisory committee created for the purpose of presenting recommendations to the Commission on "advancing equity in the provision of and access to digital communication services and products for all people of the United States, without discrimination on the basis of race, color, religion, national origin, sex, or disability." In chartering the CEDC, the Commission renewed the charter of the Advisory Committee on Diversity and Digital Empowerment under a new name. Within the CEDC is the Digital Empowerment and Inclusion Working Group that was tasked with recommending "model policies and best practices that can be adopted by States and localities to ensure that broadband internet access service providers do not engage in digital discrimination" as required by section 60506(d).

27. Since its formation, the CEDC and its working groups have taken significant steps towards satisfying its

mission. On November 7, 2022, the CEDC submitted Recommendations and Best Practices to Prevent Digital Discrimination and Promote Digital Equity to the Commission. The CEDC found that "COVID–19 exacerbated economic disparities for those who did not already have access to broadband services, especially in communities of color, where a lack of broadband access can reinforce systemic inequality. The CEDC further found that data supported the conclusion that minority status and income correlated with broadband access. To that end, the CEDC compiled findings from its three CEDC Working Groups and proposed recommendations for, among other things, model policies and best practices for states and localities that address discrimination in broadband access.

28. Moreover, in furtherance of its mission, on March 23, 2023, the CEDC convened a range of community organizations, broadband internet access providers, federal agencies with emergency broadband funding, and state agencies to assess lessons learned concerning programs that provided broadband connectivity to communities during the pandemic. The CEDC released recommendations on this topic on June 15, 2023.

Task Force To Prevent Digital Discrimination

29. Force to Prevent Digital Discrimination (Task Force). The Task Force is charged with coordinating the development of rules and policies to combat digital discrimination and promote equal access to broadband, overseeing the development of model state and local policies, and improving how the Commission seeks feedback from persons facing digital discrimination in their communities.

30. The Task Force has engaged in significant outreach nationwide to understand the depth of problems in accessing broadband, particularly as experienced by persons in historically excluded, low-income, rural, and marginalized communities. On January 25, 2023, the Task Force released a Broadband Access Experience Form for consumers to state their experience with accessing broadband internet. The Task Force explained that the experiences shared by consumers help inform the work of the Commission. Further, the Task Force has held numerous public listening sessions to gain additional information and understanding from affected communities, state, local and Tribal governments, public interest advocates, and providers about challenges, barriers, and experiences with accessing broadband. In addition,

the Task Force conducted outreach efforts to educate the public on the Commission's rulemaking procedure, and to gather data, narratives, best practices, and recommendations. Summaries of these listening sessions and meetings have been entered into the record in this proceeding.

### Notice of Inquiry and Notice of Proposed Rulemaking

31. The Commission has taken iterative steps to form a robust record for the rules adopted in today's *Report and Order*. In March 2022, the Commission released a *Notice of Inquiry* seeking comment on the rules that the Commission should adopt to implement section 60506. By the *Notice of Inquiry*, the Commission invited comment on the requirements encompassed in section 60506, in order to inform a forthcoming rulemaking to implement the requirements of the statute.

32. In December 2022, the Commission released a *Notice of Proposed Rulemaking (NPRM)* seeking focused comment on potential rules to address digital discrimination of access pursuant to section 60506. The Commission sought comments on its proposals to: (1) adopt a definition of "digital discrimination of access," (2) revise the Commission's informal consumer complaint process to accept complaints of digital discrimination of access, and (3) adopt model policies and best practices for states and localities combatting digital discrimination of access. The Commission also sought comment on other rules the Commission should adopt to facilitate equal access and combat digital discrimination of access, and on the legal authority for adopting rules. The Commission received more than 1,400 pages of record comments and ex partes from a wide range of stakeholders including public interest organizations, broadband internet access providers, state, local and Tribal governments, industry advocacy organizations, and research institutes. Informed by this record, we adopt rules in fulfillment of our mandate from Congress in section 60506 of the Infrastructure Act.

### Discussion

33. Based on our review of the record received in response to the *Notice of Inquiry* and *NPRM*, we adopt rules in this *Report and Order* to implement subsections (b), (d) and (e) of section 60506. First, we adopt a definition of "digital discrimination of access" and explain its component parts. Next, we adopt rules to prohibit digital discrimination of access. Third, we outline the scope of that prohibition,

identifying the consumers, entities, and services covered by the prohibition. Fourth, we adopt rules for enforcing the prohibition and other requirements set forth in our rules, and we explain how we will assess when a policy or practice differentially affects consumer access to broadband internet access service. Finally, we adopt changes to our informal complaints process so the Commission can accept digital discrimination of access complaints, address other issues on the record, and adopt model policies and best practices for states and localities combating digital discrimination.

### Definition of Statutory Terms

34. Section 60506 is part of a comprehensive broadband access and affordability framework intended to expand broadband coverage in the United States, improve the quality of broadband services, and increase broadband adoption rates in low-income communities. As many commenters note, the bulk of the Infrastructure Act's broadband-related provisions are directed toward (1) improving broadband access in unserved and underserved communities by incentivizing investment in hard-to-build areas (principally through tens of billions of dollars in federally administered grants), and (2) improving broadband adoption rates in low-income communities through subsidies to qualifying consumers for high-speed broadband service and related equipment.

35. The Infrastructure Act's historic investment incentives represent an acknowledgement by Congress that: (1) deploying, upgrading, and maintaining high-speed broadband networks is an expensive enterprise, even for the largest of broadband providers, (2) networks will only be built where they can be deployed at acceptable cost and then profitably operated, and (3) such legitimate, profit and loss considerations likely account for many of the gaps in access to high-speed broadband service across the United States. The investment incentives in the Infrastructure Act directly address the very real technical and economic constraints facing many broadband providers as they work to expand their networks to reach unserved and underserved communities across the country.

36. But even while seeking to address these legitimate business constraints, Congress recognized that other factors might also have played a significant role in creating and maintaining the digital divide in the United States. Thus, alongside the ambitious programs in the

Infrastructure Act for improving broadband access in unserved and underserved communities, Congress, in section 60506, specifically directed the Commission to facilitate equal access to broadband service, including addressing discrimination in the provision of access to broadband service.

37. Section 60506(a) first declares "the policy of the United States that, insofar as technically and economically feasible . . . subscribers should benefit from equal access to broadband internet access service within the service area of a provider of such service . . . [and that] the Commission should take steps to ensure that all people of the United States benefit from equal access to broadband internet access service." Section 60506(b) then directs the Commission to "adopt final rules to facilitate equal access to broadband internet access service, taking into account the issues of technical and economic feasibility presented by that objective," and mandates that those rules include "preventing digital discrimination of access based on income level, race, ethnicity, color, religion, or national origin" and "identifying necessary steps for the Commission[ ] to take to eliminate" such digital discrimination of access.

38. Critically important to our understanding of the reach of section 60506 is its definition of "equal access." Section 60506(a) declares in the Statement of Policy that the Commission should take steps to ensure "equal access" to broadband internet access service across our Nation, and section 60506(b) directs the Commission to adopt rules to "facilitate equal access" to broadband internet access service. The "equal access" that we are to ensure and facilitate is defined in subsection (a)(2) as "the *equal opportunity* to subscribe to an offered service that provides comparable speeds, capacities, latency, and other quality of service metrics in a given area, for comparable terms and conditions." The statute thus focuses the Commission's energies on the objective of *equal opportunity*, a concept and goal that is well known in American life. And in service of this equal opportunity goal, the Commission is directed, and thereby authorized, to adopt rules to prevent discrimination on the listed bases and to identify ways to eliminate its occurrence and effects.

### Digital Discrimination of Access Defined

39. By enacting section 60506, Congress vested the Commission with authority to adopt and enforce rules to address the problem of digital discrimination of access. To achieve

that purpose, the *Notice* advanced proposals for defining "digital discrimination of access" and the legal standard for determining a violation of the rules. We adopt the following definition of "digital discrimination of access," which is essentially identical to our proposal in the *Notice*: Policies or practices, not justified by genuine issues of technical or economic feasibility, that (1) differentially impact consumers' access to broadband internet access service based on their income level, race, ethnicity, color, religion, or national origin or (2) are intended to have such differential impact.

40. In so defining "digital discrimination of access," we find that to achieve the statute's equal access purposes, the legal standard must address not only business conduct motivated by discriminatory intent, but also business conduct having discriminatory effects.

41. Virtually all commenters agree that digital discrimination of access encompasses business conduct motivated by discriminatory intent. Certainly treating a person or a group of persons "less favorably than others because of a protected trait" is "the most easily understood type of discrimination." Under our adopted rules, business conduct motivated *by discrimination* on one of the six listed bases (income level, race, color, ethnicity, religion, and national origin) would generally be prohibited.

42. The disagreement among commenters centers on whether policies and practices having discriminatory *effects* should be prohibited under our definition of digital discrimination of access. Most industry commenters argue that the definition must be limited to disparate treatment, *i.e.*, intentional discrimination, relying largely on case law interpreting the Fair Housing Act (FHA) and asserting that a Commission rule permitting claims based on disparate impact, *i.e.*, discriminatory effect, would conflict with other provisions of the Infrastructure Act, and could disincentivize investment in broadband networks. On the other hand, most public interest and government commenters, relying on the same case law, argue that the rule must encompass disparate impact claims because most discrimination in broadband access stems from business practices having discriminatory effect, and any rule that excludes a disparate impact liability standard would render section 60506 largely meaningless. In adopting a definition of digital discrimination of access that encompasses both disparate treatment and disparate impact, we are guided primarily by the text of the

statute, including its expressly stated goal of ensuring "equal access" to broadband internet access service.

*Section 60506 Supports the Commission's Adoption of the Legal Standards Stated in the Defined Term*

43. Statutory interpretation focuses on "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." The text and context of section 60506 of the Infrastructure Act fully support our adopted definition of digital discrimination of access and its application, as does the overall framework of the Infrastructure Act and section 60506.

*Disparate Treatment*

44. Section 60506 plainly addresses intentional discrimination, *i.e.*, an intentional act that treats a person, or group of persons, "less favorably than others because of a protected trait." Virtually all commenters agree on this point, and we find no basis for disagreeing with this consensus view. Our definition of "digital discrimination of access" thus includes any act by a covered entity that is intended to differentially impact access to broadband internet access service on one of the listed bases and is not justified by genuine issues of technical or economic feasibility. Based on the record before us, we do not expect to encounter many instances of intentional discrimination with respect to deployment and network upgrades, as there is little or no evidence in the legislative history of section 60506 or the record of this proceeding indicating that intentional discrimination by industry participants based on the listed characteristics substantially contributes to disparities in access to broadband internet service across the Nation. Moreover, in the cases in which we do encounter intentional discrimination, we believe the entity that engaged in the discriminatory conduct will be hard pressed to justify such conduct on technical or economic feasibility grounds. Therefore, while we will allow such justifications to be raised and will consider them on a case-by-case basis, we expect that in most cases, a determination that a covered entity engaged in intentional discrimination will lead to a finding of liability under our rules.

*Disparate Impact*

45. In determining whether section 60506 authorizes us to include disparate impact in our definition of digital discrimination of access, we look to the guidance provided in the Supreme

Court's decision in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project*, 576 U.S. 519, 533 (2015) (*Inclusive Communities*). There, the Court set out a framework for determining when an antidiscrimination statute "must be construed to encompass disparate impact claims." Under that framework, a disparate impact legal standard is authorized where the statutory text is "results based" and such a standard is "consistent with statutory purpose." And, where evidence of a statistical disparity is shown to support a complaint of disparate impact, liability is properly limited where (1) the challenged policy or practice is shown to cause the disparity complained about, and (2) business owners are permitted to explain the valid interests served by the challenged policy or practice. We find that 60506 authorizes a disparate impact liability standard and that our implementing rules, outlined below, fully comport with the limiting criteria set out in *Inclusive Communities*.

*Statutory Text and Context*

46. The language of section 60506 falls within Division F (Broadband Access) of the Infrastructure Act, where Congress addresses the problem of the "digital divide" in our country and the urgency of corrective action because "[a]ccess to affordable, reliable, high-speed broadband is essential to full participation in modern life in the United States." The term "equal access" is defined in section 60506 as "the equal opportunity to subscribe to an offered service" of comparable quality on comparable terms and conditions. The term "equal access" lies at the center of section 60506's Statement of Policy in subsection (a). At subsection (b) Congress directs the Commission to adopt final rules to "facilitate equal access" which includes "preventing digital discrimination" and "identifying necessary steps . . . to eliminate [such] discrimination." As we explain below, the facial text, context and purposes of the statute establish Congress's intent that our implementing rules address conduct having discriminatory effects as well as conduct motivated by discriminatory intent.

47. The operative text mandates the adoption of rules to "facilitate equal access to broadband" which includes "preventing digital discrimination of access based on" specified characteristics, and "identifying necessary steps . . . to eliminate [such] discrimination." The term "equal access" is defined in section 60506(a) as "the *equal opportunity* to subscribe to an offered service" of comparable

quality on comparable terms and conditions and lies at the center of section 60506's Statement of Policy. We reject the argument that section 60506(a)(2) "is irrelevant to the meaning of 'discrimination'" even if it focuses on consequence. As explained, we interpret "of access" in subsection. (b)(1) to incorporate the definition of "equal access" in (a)(2). At subsection (b), Congress directs the Commission to adopt final rules to "facilitate equal access" to broadband internet access service. Like Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act, section 60506 defines "access" in terms of opportunity. Because the statute defines "access" as the *opportunity* to subscribe," this operative text focuses on the impact of a policy or practice on the consumer's chance or right to obtain service rather than intent.

48. Courts commonly look to the "ordinary meaning" of a statute's words to interpret their meaning when the statute itself does not provide a definition. Looking at other operative text of section 60506, given its ordinary meaning, we find that each term targets the "consequences of actions." For undefined statutory terms, courts can look to the "dictionary for clarification of the plain meaning of words selected by Congress." For instance, subsection (a)(1) of the statute focuses on the "opportunity" to subscribe [1] and subsection (a)(3) states that consumers should "benefit" from equal access to broadband. The plain meaning of "opportunity" is "a good chance for advancement or progress," and "benefit" means "to receive help or an advantage." Neither term depends on the mindset of the actor, but rather the effect of the action. Section 60506(b), moreover, directs the Commission to "facilitate" equal access by "preventing" digital discrimination of access, and identifying necessary steps to "eliminate" it. The plain meaning of "facilitate" is "to make easier or help bring about." The meaning of "prevent" as referenced in subsection (b)(1) is "keep[ing] [something] from happening or arising," and "eliminate" as referenced in subsection(b)(2) means to "put an end to or get rid of." Commenters urge us to adopt a disparate impact legal standard due to the documented disparities in broadband access nationwide. Again, these definitions, taken from the Merriam-Webster's (online) Dictionary, clearly suggest an effects-based orientation—whether looking at each word independently or in context as

written in the statute—rather than a singular focus on the mindset of the actor. Equal access can be denied by policies and practices having discriminatory effects even where no discriminatory motive is present, and it is our considered view that most of the gaps in access to broadband internet service in our country, to the extent that they are not a product of legitimate business constraints that Congress sought to address in other provisions of the Infrastructure Act, stem from policies and practices that are neutral on their face, rather than from intentionally discriminatory conduct on the part of covered entities and other industry participants. Further, the use of the words "based on" in section 60506(b)(1) does not limit its reach to instances of intentional discrimination under controlling precedent. Some commenters argue that the statute's use of the term "based on." limits the statute to an intent-only legal standard. This argument by commenters has already been expressly rejected by the Supreme Court in *Griggs* v. *Duke Power Co.*, 401 U.S. 424 (1971) (*Griggs*) and its progeny. Looking at the other nondiscrimination statutes that contain similar "based on" language—section 703(a)(2) of Title VII, section 4(a)(2) of the ADEA, and section 804(a) of the FHA—each of these statutes were found by the Court to authorize disparate impact claims because of the results-based statutory language. Just as with these antidiscrimination statutes, section 60506's "based on" text does not foreclose utilizing a disparate impact legal standard. The disparate impact standard is authorized by section 60506, as it is drawn from the "equal access" and other "results-based" statutory language and clear purposes of the statute.

49. In reaching this conclusion, we are mindful of the history of disparate impact analysis as it applies to federal anti-discrimination statutes. It was first addressed in *Griggs*, where the Supreme Court interpreted section 703(a)(2) of Title VII of the Civil Rights Act to authorize disparate impact liability. Section 703(a)(2) of Title VII made it "an unlawful practice for an employer" to "limit, segregate, or classify . . . employees or applicants for employment in any way which would deprive any individual of employment opportunities *or otherwise adversely affect* his status as an employee because of such individual's race, color, religion, sex or national origin." There, the Court interpreted the statutory text to prohibit not only "overt discrimination" but also "practices that are fair in form, but

discriminatory in operation." Further, the Court stated that "[u]nder [Title VII], practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." The Court reasoned that from this language "Congress directed the thrust of [Sec. 703(a)(2)] to the consequences of employment practices, not simply the motivation." Notably, the Court stated that the statute's goal of achieving "*equality of employment opportunities* and remov[ing] barriers that have operated in the past" to favor some individuals over others afforded protected status must be interpreted to allow disparate impact claims. Section 4(a)(2) of the Age Discrimination in Employment Act (ADEA) contains similar language as that of Title VII, and a plurality of the Court in *Smith* v. *City of Jackson*, 544 US 228 (2005) (*Smith*), ruled that the statutory text authorized disparate impact liability just as it did in *Griggs*.

50. Similar reasoning was employed in examining section 804(a) of the FHA by the Court in *Inclusive Communities*, even though the provision used different results-based language than did Title VII and the ADEA. The FHA makes it unlawful to "refuse to sell or rent . . . or otherwise make unavailable or deny, a dwelling to any person because of" a protected status. The Court in *Inclusive Communities* observed "the logic of *Griggs* and *Smith* provides strong support for the conclusion that the FHA encompasses disparate-impact claims" even though the results-oriented language was different. The Court observed that "[i]t is true that Congress did not reiterate Title VII's exact language in the FHA, but that is because to do so would have made the relevant sentence awkward and unclear." So, instead, "Congress thus chose words that serve the same purpose and bear the same basic meaning but are consistent with the structure and objectives of the FHA." Likewise, in the context of section 60506, Congress did not repeat the results-based language that appears in Title VII, the ADEA, the FHA or the many other federal anti-discrimination statutes that have been determined to prohibit disparate impacts or specified bases. Title VI authorizes promulgation of disparate impact regulations. Instead, Congress chose words appropriate to the statute's purpose of promoting equal access to broadband internet service; the statute appropriately references "equal access," "equal opportunity" and other terminology that goes to results or

---

[1] 47 U.S.C. 1754(a)(1).

consequences of actions (or counteracting those results or consequences), and not to the mindset of actors. For these reasons, we disagree with commenters who argue that section 60506 does not have results-oriented language or other textual markers that authorize disparate impact liability.

### Statutory Purpose

51. Our reading of the statutory text to encompass disparate impact aligns with the overall scheme of the Infrastructure Act, and with the purpose of section 60506 specifically. As described above, promoting broadband internet access has been a longstanding policy objective for the Commission. The 1996 Act expanded the scope of universal service to include advanced services such as broadband internet service, and the Commission used its universal funding programs to address the persistent digital divide. Then, in 2020, the global COVID–19 pandemic necessitated social distancing that made the ongoing digital divide even more evident and troublesome. Some commenters in this proceeding argue, directly or indirectly, that "digital discrimination" does not exist. But those arguments are belied by Congress's findings in the Infrastructure Act and the record compiled in this proceeding correlating the digital divide with historical discrimination. In all events, Congress directed the Commission to take swift action to prevent digital discrimination of access. Therefore, we do not find it necessary to evaluate claims by commenters that digital discrimination of access does not exist. Such arguments would more appropriately have been made to Congress when it was considering this legislation. We have neither the authority, nor the inclination, to question the factual bases for Congress's directives to the Commission. Indeed, section 60506 aligns with the Commission's longstanding obligation to promote nondiscrimination in the telecommunications sector. Section 202(a) of the Communications Act is a nondiscrimination provision that makes it unlawful for common carriers to "discriminate[] in charges, practices, classifications, regulations, facilities, or services for or in connection with like communications service . . . or to . . . . advantage . . . any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage." It requires no showing of discriminatory intent to establish a violation. Under section 202, where "like communications services" are

provided by the same provider but on different terms or conditions, the provider must justify any difference as reasonable.

52. Gaps in access to high-quality broadband across the country led Congress to enact the broadband-related provisions of the Infrastructure Act, which creates historic investment incentives and affordability subsidies to address some of the causes of the digital divide. The Infrastructure Act also clearly mandates certain prophylactic measures to address discriminatory conduct that is not addressed elsewhere in the legislation. For the past half century, our country's civil rights jurisprudence has recognized that equal opportunity to achieve economic and social benefits can be denied intentionally because of the personal characteristics or status of the person seeking the opportunity or benefit, or it can be denied unintentionally because of facially neutral policies or practices that disproportionately exclude persons possessing such characteristics or status, and both types of denial are unlawful. Disparate impact analysis has maintained its foundational standing in the courts, most recently in *Inclusive Communities*, as a means for addressing harm caused by policies or practices that have discriminatory effects and lack adequate business justification. We find that by defining the goals of section 60506 in terms of "equal access" and "equal opportunity," especially in light of the 52-year history of disparate impact analysis in civil rights law, Congress expressed its intention that the Commission's implementing regulations address business conduct having the effect of denying designated groups of consumers the equal opportunity to subscribe to an offered broadband service, regardless of the motivation for such actions.

53. As further support for the Congressional purpose that drives our actions today, the record in this proceeding contains substantial evidence of gaps in access among persons in some low-income, rural, Tribal, and minority communities. As noted above, there is little or no evidence in the legislative history of the Infrastructure Act or the record of this proceeding that impediments to broadband internet access service are the result of intentional discrimination based on the criteria set forth in the statute. Rather, we must conclude that such impediments are more likely driven by neutral policies or practices (*i.e.,* business decisions) that have discriminatory effects.

### Section 60506 Properly Limits Disparate Impact Liability

54. Even where a statute contains "results based" text that authorizes disparate impact claims, the liability standard must require a showing that a challenged policy or practice is causing the disparity complained about, and "avoid displacement of legitimate practices." Both of these factors are met by the rules we adopt today.

55. First, we will require that any determination of differential impact that relies on observed disparity must point to a specific policy or practice that is causing the disparity. A "robust causality requirement" ensures that any statistical imbalance does not alone establish liability and thus protects covered entities "from being held liable for . . . disparities they did not create." We therefore require that any determination of liability under our rules that is founded on statistical disparity must include a determination that the disparity is caused by a specific policy or practice of the covered entity under investigation.

56. Next, the rules will give covered entities an opportunity to present justifications for discriminatory policies and practices. Section 60506 sets out such limitation by requiring that our rules facilitate equal access while taking into account "issues of technical and economic feasibility." Where the Commission believes there is credible evidence that a covered entity's policy or practice differentially impacts access to broadband internet access service on the basis of income level, race, ethnicity, color, religion, or national origin, the covered entity will have the opportunity to prove that the policy or practice is nevertheless "justified by genuine issues of technical or economic feasibility." We anticipate that such justification will include proof that there is not a reasonably available and achievable alternative policy or practice that would serve the entity's legitimate business objectives with less discriminatory effect. In this *Report and Order,* we explain the meaning of these terms, and how they will be applied on a case-by-case basis in the context of our self-initiated investigations of digital discrimination of access complaints.

### Adopting a Rule That Encompasses Disparate Impact Claims Does Not Conflict With the Infrastructure Act's Funding Programs and Will Not Chill Broadband Investment

57. Contrary to some commenters' claims, including disparate impact in our definition of digital discrimination of access does not conflict with the

broadband funding programs set out in the Infrastructure Act and will not otherwise chill investment in broadband networks. The deployment and digital equity funds provided for in the Infrastructure Act prioritize unserved and underserved areas by addressing technical and economic issues that have hindered investment in "hard-to-build" areas. By contrast, section 60506 and the Commission's implementing rules are centered on conduct that does not stem from such issues. Our definition of "digital discrimination of access" highlights this contrast by specifically exempting policies and practices that are justified by "genuine issues of technical and economic feasibility." Thus, the discrimination addressed in section 60506 and our implementing rules is not addressed in other provisions of the statute, and vice versa. There is no conflict.

58. Nor do we believe that including disparate impact in our definition of digital discrimination of access will chill investments in broadband networks. Congress has provided historic funding incentives aimed to spur broadband investments in unserved and underserved communities throughout the United States. Those incentives, once again, address the very real technical and economic challenges that have hindered deployment, upgrades, and maintenance of networks in those communities. We are not persuaded that adoption of a disparate impact standard will disincentivize economic investments in networks out of fear that doing so might somehow require uneconomic investments. Again, we emphasize that under the rules we adopt today, there can be no liability determination for disparate impact unless (1) there is a differential in access to broadband service; (2) the differential is caused by a specific policy or practice of the covered entity; and (3) the covered entity fails to prove that the policy or practice is justified on genuine technical or economic grounds. When providing broadband access to a particular area is impeded by genuine issues of technical or economic feasibility, the covered entity should be able to explain those issues and offer substantial evidence to support them. While our rules will require greater diligence by covered entities in determining and documenting the reasons for access gaps in their service areas, we do not think that result is overly burdensome in furtherance of the statutory goal of equal access, nor do we think it will disincentivize investment in broadband networks.

*Other Considerations*

59. Having reached the central determinations for adopting a definition of digital discrimination of access and the applicable legal standards, we respond to other considerations commenters raise. Commenters raise additional arguments regarding interpretation of "equal access," legislative history, and the role that a covered entity's profitability and access to consumer data should play in our definition of digital discrimination of access analysis. We address each of these considerations in turn.

60. *Interpretation of "equal access."* Commenters urge us to interpret "equal access" to require a showing of intent. Given that "equal access" is defined by statute, is inherently "results based," and is coupled with other operative terms that are "results based," we must reject each of these proposals. Some commenters argue that the intent legal standard should apply specifically to digital discrimination of access claims that pertain to the characteristics of particular technologies. We find no basis for adopting different legal standards for specific technologies because the rules we adopt today are sufficiently flexible to accommodate all technologies through which broadband internet access service is provided. Certainly, requiring any showing of intent would conflict with our reasoned interpretation of the statutory text and purpose. Commenters disagree as to whether language in recent telecommunications laws explicitly referencing intent is relevant. Given the disagreement on the record and that section 60506's statutory text authorizes a legal standard showing for discriminatory effect, we are not persuaded that we should adopt an intent-only legal standard. We likewise decline the City of Long Beach's suggestion that we "should seek to achieve and facilitate *equitable* access[]" rather than equal access," because that interpretation would directly conflict with the Statement of Policy. We also reject TechFreedom's proposal to give a fluid meaning to "equal access" that would vary from the definition in the statute. In particular, TechFreedom argues that the word "access" in section 60506(b)(1) "has a purely technical meaning: it is the technological 'capability to transmit [. . .] and receive data' enjoyed by the user." We disagree. Because "preventing digital discrimination of access" is included within the broader mandate of rules to "facilitate equal access," the word "access" in the phrase "preventing digital discrimination of access"

incorporates the statutory definition of "equal access." Congress defined "equal access" as "the equal opportunity to subscribe" to broadband. Thus, "digital discrimination of access" is best understood as referring to discrimination in the "opportunity to subscribe." For those same reasons, we also disagree with commenters who argue that section 60506's operative text does not contain results-oriented language. As the term "equal access" is expressly defined in section 60506(a)(2) and "access" as used in section 60506 (b)(1) is a derivative of that definition, we find no basis or authority to deviate from the statutory text. Some commenters request that we give "digital discrimination" and "digital discrimination of access" the same meaning, or define only the term "digital discrimination" We decline to do so. We define and give meaning to "digital discrimination of access" because Congress charged the Commission with adopting rules that "prevent[] digital discrimination of access" in subsection (b), and defining that term in our rules better aligns with our mandate to "facilitate equal access" in this proceeding.

61. We also disagree with Lincoln Network's argument that the statute's reference to an "opportunity" to subscribe requires a disparate treatment standard. This interpretation ignores that a consumer's "opportunity" to subscribe could be impeded by policies and practices having discriminatory effects even where discriminatory intent is absent. Consequently, limiting our definition to conduct motivated by discriminatory intent would not fully accomplish our mandate from Congress to facilitate equal access to broadband service and prevent discrimination on the listed bases.

62. *Interpretation of legal standards.* We disagree with commenters who argue that the terms of section 60506 do not support including disparate impact in our definition of digital discrimination of access. AT&T argues that the phrase "to facilitate equal access" speaks only to the Commission's broader obligations to incentivize broadband deployment and does not support using disparate impact analysis to reach that objective. CTIA argues that Congress would not have used the term "facilitate" "if it intended for the Commission to create a burdensome liability and enforcement regime." As explained herein, the statutory text, context, and purposes of the Infrastructure Act and section 60506 make clear that Congress intended that our rules addressing digital discrimination of access reach not only

discriminatory treatment, but also policies and practices having discriminatory effect. By commenters' own admission, there is little to no evidence of intentional digital discrimination of access. The Commission is obligated to adhere to Congress's mandate and adopt rules that address the problems that do exist rather than those that do not.

63. *Legislative History.* Commenters argue that the sparse legislative history of section 60506 and/or the absence of a specific mention of disparate impact in the legislative history forecloses inclusion of a disparate impact liability standard. We disagree. As explained by this *Report and Order,* we conclude that the text, context, and purpose of the statute clearly authorize that liability standard. USTelecom argues, however, that Title VII of the Civil Rights Act, the FHA, and the ADEA were all grounded in a congressional record of "specific, historic discrimination that the statute was designed to remedy and prevent" and that history of discrimination in the legislative history supported a disparate impact liability standard. While the legislative history of section 60506 is not as robust as that of Title VII, the ADEA, and the FHA, the Supreme Court has made clear that even "silence in the legislative history . . . cannot defeat the better reading of the text and statutory context. . . . If the text is clear, it needs no repetition in the legislative history; and if the text is ambiguous, silence in the legislative history cannot lend any clarity." As to section 60506, the text, statutory context, and purpose is clear. The statute's text and purpose, to promote equal access to broadband internet, fully authorize including a disparate impact liability standard for enforcing our prohibition against digital discrimination of access. Some commenters argue that our reading of section 60506 is foreclosed because disparate-impact liability would enable the Commission to regulate the rates of broadband internet access service providers, "impose requirements to build-out service, and more." But the "new regime of unfunded mandates and price regulation" that these commenters posit has no foundation in the rules we adopt herein. We also note our agreement with the Lawyers' Committee that the major questions doctrine has no application to our implementation of section 60506.

64. *Profitability Considerations.* We additionally decline the suggestion in the policy paper submitted by the Americans For Tax Reform and Digital Liberty that we define digital discrimination of access "[as] when differences in the deployment of and/or

the quality, terms, and conditions of access to broadband services are not explained by differences in the profitability of serving the different areas, but instead reflect non-economic decisions to underserve protected classes in a manner that causes adverse or negative consequences." This definition would limit the Commission to considering "profitability" rather than "issues of technical and economic feasibility," and would appear to place primary weight on economic rather than technical considerations. Our adopted rule properly includes both technical and economic considerations, as explained in this *Report and Order.*

65. *Data Access.* The LGBT Technology Partnership proposes that we adopt a definition of digital discrimination of access that encompasses data access concerns and issues pertaining to personal data that is processed by an algorithm. We decline to include that within the scope of our covered services. By LGBT Technology Partnership's own admission, section 60506 is "not directly related to how emerging technologies like algorithms facilitate greater precision of structural discrimination." However, to the extent that such privacy- and data-related practices can be shown to differentially affect consumer access to broadband service on one or more of the listed bases, those practices might fall within the scope of our definition.

### Technical and Economic Feasibility

66. Section 60506 twice references technical and economic feasibility. First, as noted above, Congress declared in section 60506(a)(1) the "policy of the United States that, *insofar as technically and economically feasible* . . . subscribers should benefit from equal access to broadband internet access service within the service area of a provider of such service . . . ." And in section 60506(b), Congress directed the Commission to "adopt final rules to facilitate equal access to broadband internet access service, *taking into account the issues of technical and economic feasibility presented by that objective* . . . ."

67. These references are clear indicators that full achievement of the "equal access" and "equal opportunity" goals of the statute might, in some instances, be limited by genuine technical or economic constraints. If the technology does not yet exist to provide a particular broadband internet access service to a particular geographic area, or the technology to provide the service does exist but utilizing it to reach the area in question would be prohibitively expensive, the failure to provide that

specific service to that specific area would be explained by genuine technical or economic constraints. In order to account for these types of circumstances, in our December 2022 *NPRM,* we proposed to define the term "digital discrimination of access" in section 60506(b)(1) such that any Commission determination that prohibited discrimination has occurred must be preceded by analysis of whether the policy or practice in question was "justified by genuine issues of technical or economic feasibility." Having adopted a definition of "digital discrimination of access" that includes a specific carve out for conduct found to be so justified, we now adopt definitions for the terms "technically feasible" and "economically feasible" in the context of section 60506 and we explain how the Commission will evaluate "genuine issues of technical or economic feasibility" under our rules. We agree with commenters that our application of these concepts is critical to the successful implementation of section 60506.

### *Technical and Economic Feasibility Are Fundamental Components of Digital Discrimination of Access*

68. We first find that including the carve out for technical and economic feasibility in our definition of "digital discrimination of access" is the soundest, most straightforward, and most effective means of satisfying our statutory responsibility to facilitate equal access while "taking into account the issues of technical and economic feasibility presented by that objective." We disagree with those commenters that suggest we omit the carve out language or argue that it should only be considered as an affirmative defense that the Commission were to create a structured complaint process to receive allegations of digital discrimination of access. We are also not persuaded by the argument that feasibility should not be included in our definition because it is not included in subsections (b)(1), (d), or (e). The proffered construction misreads subsection (b), which places feasibility concerns squarely within each of the tasks assigned to the Commission under that subsection. We similarly decline USTelecom and WISPA's request that we omit the word "genuine" from the carve out. The record reflects widespread concern that naked assertions of technical or economic infeasibility could become a loophole to complying with our digital discrimination of access rules such that they would not actually "facilitate equal access to broadband" as Congress intended. We include the word

"genuine" in our definition of digital discrimination of access to convey that bare assertions and justifications created after the fact will not suffice to prove that a business practice falls within the carve out and is therefore exempt from liability.

### Consideration of Technical and Economic Feasibility Supports a Disparate Impact Approach

69. We further find that Congress's directive in section 60506(b) that we take into account issues of technical and economic feasibility supports including a disparate impact approach in our definition of "digital discrimination of access" and fits neatly into the framework of disparate impact analysis. Under traditional disparate impact analysis, once a policy or practice is shown to have a meaningful adverse impact on a protected group, the covered entity may affirmatively produce evidence that the challenged policy or practice is justified by a substantial, legitimate business interest. If the covered entity does so, it may still be liable if there is a less discriminatory alternative to the challenged policy or practice. Congress's directive that the Commission take into account issues of technical and economic feasibility represents a formulation of this traditional test as tailored to the specific context of section 60506 and the issues it aims to address. As further discussed above in the disparate impact paragraphs and below in the enforcement-related paragraphs, a covered entity in a Commission investigation under section 60506 will likewise have the opportunity to show that the policy or practice under scrutiny is justified by genuine technical or economic constraints. And as part of the Commission's consideration of these issues, a covered entity will be allowed to present for the Commission's review any legitimate business impediment to the use of less discriminatory alternatives. We find that the feasibility provision is largely superfluous to intentional discrimination of access, and that when Congress directed the Commission to be mindful of technical and economic considerations, its objective was to ensure that covered entities in any investigation the Commission conducts under our rules to prevent digital discrimination of access would have an opportunity to explain and justify their conduct.

70. We disagree with commenters asserting that the technical and economic feasibility language in section 60506 does not support inclusion of disparate impact in our definition of

digital discrimination of access. These commenters fail to explain why consideration of technical and economic feasibility makes sense only in the context of disparate treatment claims or why it makes more sense in the context of disparate treatment claims than in the context of disparate impact claims.

71. We are also not persuaded by AT&T's argument that Congress's contemplation of technical and economic justifications for challenged practices does not support an inference that Congress intended to capture cases of disparate impact. AT&T argues that section 60506's feasibility provision has "independent significance even if Congress intended the Commission to address only intentional discrimination" because "income levels are routinely used [] as a basis for business decisions in a wide variety of [] industries." But as the Lawyers' Committee for Civil Rights Under Law notes, "there is still no scenario in which intentional discrimination on the basis of income level—or any other protected characteristic—could ever be justified by technical feasibility." We find that AT&T's reading "is thus at odds with one of the most basic interpretive canons, that '[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . .'" And, as we have stated elsewhere, there is little or no evidence in the legislative history or in the record of this proceeding that intentional discrimination on *any* basis by industry participants contributes meaningfully to the digital divide in this country. AT&T also argues that the feasibility provision does not support the existence of disparate-impact liability under section 60506 because it "applies to the broader mandate to the Commission to 'facilitate equal access' and is not restricted only to the narrower included 'discrimination' provision." In response, Lawyers' Committee for Civil Rights Under Law argues that, "the feasibility qualifier must also apply to [(b)(1)] providing specific instructions on how the Commission needs to execute that preamble. AT&T does not explain how the 'preventing discrimination' provision—if interpreted to cover only intentional discrimination—would 'tak[e] into account technical and economic feasibility.'"

### Definitions of "Technically Feasible" and "Economically Feasible"

72. As discussed in more detail below, we adopt clear definitions of the terms "technically feasible" and "economically feasible" based on the

record in this proceeding and Commission precedent; and, we explain how the Commission will assess issues of technical or economic feasibility under section 60506(b). We interpret section 60506(b)'s reference to "issues of technical and economic feasibility" to mean issues of "technical feasibility" on the one hand, and issues of "economic feasibility" on the other. We understand subsection (a)'s use of "technically and economically feasible" and subsection (b)'s use of "technical and economic feasibility" to reference the same concepts. We define a "technically feasible" policy or practice to mean one that is "reasonably achievable as evidenced by prior success by covered entities under similar circumstances or demonstrated technological advances clearly indicating that the policy or practice in question may reasonably be adopted, implemented, and utilized." Similarly, we define an "economically feasible" policy or practice to mean a policy or practice that is "reasonably achievable as evidenced by prior success by covered entities under similar circumstances or demonstrated new economic conditions clearly indicating that the policy or practice in question may reasonably be adopted, implemented, and utilized."

73. In the *NPRM*, we sought comment on how to define and incorporate into our rules the concepts of technical and economic feasibility as they are used in section 60506. We asked detailed questions on the merits and mechanisms of adopting various approaches, including safe harbors, case-by-case analyses, or a combination thereof. Because neither the statute nor the legislative history contain definitions of these terms, the Commission must adopt an interpretation that, taken in the context of the statute as a whole, best effectuates the goal of section 60506. Based on this touchstone, the record we received in response to the *NPRM*, and Commission precedent, we adopt definitions of these terms that balance the goal of facilitating equal access to broadband internet access services with the technical and economic challenges facing covered entities as they work to expand and improve their networks in unserved and underserved communities.

74. *Commission and Legal Precedent.* We adopt definitions of "technical feasibility" and "economic feasibility" that are consistent with the Commission's precedent. The Commission has previously interpreted, individually or as a pair, the concepts of technical and economic feasibility in connection to its implementation of various statutes. While the

Commission's previous interpretations and applications of these terms have varied by context, these instances provide guidance for our implementation of section 60506. For example, the Commission has previously made determinations as to whether an activity was technically and economically feasible based on record support or lack thereof, adopted a rebuttable presumption of technical feasibility based on prior findings by a state commission, adopted a list of activity that is technically feasible, and established a process to analyze feasibility issues on a case by case basis. Furthermore, the Commission has closely scrutinized technical and economic feasibility issues, relied on industry past practice and success as key indicators of technical feasibility, and placed the burden on the entity asserting technical or economic infeasibility to prove the claim to the Commission's satisfaction.

75. Judicial case law also informs our definitions of technical and economic feasibility for section 60506 purposes. In 2002, the Supreme Court decided a challenge to the Commission's implementation of section 251 of the Communications Act that involved the Commission's interpretations of the statutory phrase "technically feasible." Petitioners in that case argued that Commission rules requiring incumbent carriers to combine unbundled network elements where "technically feasible" was unreasonable and in conflict with the statutory language. In upholding the Commission's rules, the Court rejected the petitioners' argument that the rules imposed no reasonable limits on the requirement to combine network elements. Rather, the Court held that the Commission's definition of "technically feasible" provided real limits on what would be required of incumbent local exchange carriers, concluding that "[i]f 'technically feasible' meant what is merely possible, it would have been no limitation at all." The Court's ruling, albeit in a different context, instructs that we should be skeptical of arguments suggesting that technical and economic feasibility are concepts operating at the margins of what is technical and economically *convenient* on the one hand, or what is technically and economically *possible* on the other.

76. *Technical Feasibility.* Taking into account long-standing Commission precedent, we define a "technically feasible" policy or practice as one that is "reasonably achievable as evidenced by prior success by covered entities under similar circumstances or demonstrated technological advances clearly indicating that the policy or

practice in question may reasonably be adopted, implemented, and utilized." We use the Commission's definition of "technically feasible" from § 54.5 of the Commission's rules as a starting point. When implementing the interconnection provisions of the 1996 Act, the Commission similarly leveraged prior successful practice to identify and define technical feasibility. In that context, the Commission adopted rules that established previous points of interconnection or methods of access to unbundled network elements as "substantial evidence" that analogous points or methods are technically feasible. In the context of section 60506, a policy or practice will be considered technically feasible if it is reasonably achievable, as evidenced by prior success under similar circumstances. Moreover, because technological advances might provide ready means of achieving successful outcomes that have not occurred in the past, we will allow for the possibility that technical feasibility may be shown by "demonstrated technological advances clearly indicating the reasonable achievability" of the policy or practice in question.

77. *Economic Feasibility.* We define an "economically feasible" policy or practice to mean one that is "reasonably achievable as evidenced by prior success by covered entities under similar circumstances or demonstrated new economic conditions clearly indicating that the policy or practice in question may reasonably be adopted, implemented, and utilized." We again use the language of the Commission's definition of "technically feasible" in § 54.5 as a baseline because anchoring economic feasibility in past industry practice will provide guidance to allow all interested stakeholders to gauge what is or is not economically feasible. Factors for analyzing economic feasibility of a policy or practice include, but are not limited to, projected income, projected expenses, net income, expected return on investment, competition, cash flow, market trends, and working capital requirements, and the standards under which such calculations are determined. A policy or practice will be considered economically feasible if relevant economic variables fall within acceptable ranges based on past industry practice. Determining economic feasibility thus requires a comparative analysis that accounts for past and present industry practices and new economic conditions that might, in some circumstances, require variances from such historical ranges.

78. Our definitions of "technically feasible" and "economically feasible" join previous Commission interpretations of these terms with several important attributes specific to the present context. As a baseline, we interpret the categories of "technical" and "economic" feasibility broadly to encompass any legitimate business impediment to achievement of equal access. In addition to using prior successful policies and practices as the foundation for determining what is technically or economically feasible, we design our definitions to flexibly encompass future policies and practices and the inherent differences in the operation of covered entities of varying sizes and technologies. We also take a measured approach that considers the real burdens industry participants face in deploying and providing service, while also ensuring that we do not create "a loophole that renders the rules meaningless." And lastly, we make clear that issues of technical and economic feasibility are related but ultimately distinct from each other.

79. We take a measured approach to defining these terms, providing guideposts for understanding what is technically or economically feasible today and what could be feasible in the future. We emphasize that we do not define technical and economic feasibility as simple deference to a single entity's judgment, as many industry commenters argue we should. We agree with those commenters asserting that Congress did not adopt section 60506 to enshrine the current industry status quo. When considering what is technically or economically feasible, we expect covered entities to consider more than just what is the most convenient. For example, the Commission found in other contexts that the novelty or costliness of a particular business path does not, in itself, answer the question of whether that path is feasible, nor does the difficulty of a change in product design. At the same time, we do not create an "impossibility" standard as some commenters have warned against, which would define any action as technically or economically feasible unless it was impossible. Like the Commission's approach to defining "technically feasible" in the *First Local Competition Order*, 61 FR 45476, the definitions we adopt today include reasonable limitations on what is considered technically or economically feasible and do not represent any attempt to "control" covered entities' investment decisions. Complying with the rules we adopt today does not

displace the ability of industry participants to make "practical business choices and profit-related decisions." Rather, they are designed to ensure that industry participants incorporate into their decision-making processes consideration of the potential discriminatory impacts of their policies and practices, and that they seek to minimize any such discriminatory impacts.

80. We acknowledge that the technical and economic challenges that covered entities face in deploying and serving rural, Tribal, and urban areas can vary greatly. At the same time, we agree with Public Knowledge et al. that "broadband deployment may still be feasible in areas even where there are no similar circumstances to use as a benchmark," and if feasibility "was limited to circumstances where there is a direct analog, certain areas that have gone long underserved due to unique characteristics might continue to fall through the cracks." Thus, we intend for our approach to technical and economic feasibility to encompass new, but analogous, policies and practices to account for variations among covered entity types and industry advancement. The Commission has previously crafted a definition of technical feasibility to outlast current technological development in the context of certain unbundling obligations for incumbent local exchange providers. Under those rules, the Commission adopted a rebuttable presumption that once one state had determined an approach was technically feasible, the same approach would be presumed to be technically feasible for incumbent local exchange carriers in every state. We decline at this time to adopt a presumption of feasibility, and therefore do not take the precise approach taken by the Commission in 1999. But we do find that we are similarly defining our concepts of technical and economic feasibility to allow for consideration of technical, infrastructure, economic, or other developments in the area under review. We also decline at this time to adopt any explicitly different standard for evaluating claims of economic feasibility for existing service offerings versus new deployments.

81. While our definitions of technical and economic feasibility mirror each other, and in certain respects might be related, we consider each to be a distinct concept. The Commission has taken this approach previously, and commenters urge us to adopt the same approach here. We agree that a policy or practice may be technically feasible but not economically feasible, and vice versa.

82. *Standard.* At this time, we find that a case-by-case approach provides the Commission needed flexibility to evaluate issues of technical and economic feasibility. In the *NPRM*, the Commission sought comment on whether we should assess infeasibility claims on a case-by-case basis, adopt safe harbors, or take a combination of the two. In response, commenters voiced support for each of these approaches, as well as urging the Commission to adopt blanket presumptions of feasibility as opposed to a case-by-case review. We understand the arguments in favor of the adoption of one or more safe harbors to promote regulatory certainty and reduce the regulatory burden on providers, as well as arguments favoring a list of *per se* feasible methods of providing broadband internet access service or presumptions of feasibility in all or certain instances to increase compliance. The Commission has in the past adopted rules taking each of these approaches. Based on the record and information we have today, however, we find it is premature to incorporate safe harbors or feasibility presumptions into our definitions of technical and economic feasibility. In this connection, we defer any further decisions regarding the adoption of one or more safe harbors until we have developed experience on how they would operate in practice. As explained in more detail below, we do adopt a presumption of compliance from enforcement action that we find will lower the compliance burden for covered entities without compromising consumer protection. Thus, at this juncture, we will evaluate issues of technical or economic feasibility on a case-by-case basis so as to deter violations of our rules while allowing those issues to be fully explained to and considered by the Commission.

83. We also design our case-by-case approach to flexibly account for the differences between covered entities of varying sizes, technologies, and circumstances. We agree with those commenters, like Competitive Carriers Association, who encourage us to take a "a practical and flexible approach that encourages innovation and investment to close the digital divide." Therefore, we decline at this time to adopt distinct standards or definitions for different types of covered entities. We find that our adopted definitions will allow the Commission to consider what is reasonably achievable for the particular entity under investigation. Moreover, as the Commission has found previously, legal or regulatory constraints can also

be considered when determining technical feasibility.

84. Furthermore, we find that when the Commission conducts an investigation under the enforcement process described below, the entity under investigation will have the burden of proving to the Commission that the policy or practice in question is justified by genuine issues of technical or economic feasibility. The Commission has commonly taken this approach in previous approaches analyzing "technical feasibility," as well as regarding satellite carriers claiming "technical or economic infeasibility" in the market modification context. In the context of section 60506, we find that assigning this burden to the entity under investigation is inherent in the structure of our definition of "digital discrimination of access." We find, as the Commission has previously, that as a practical matter, it is the entity providing the justifications for its policies and practices that has access to the necessary information to support their factual assertions. And, as we have previously stated, those justifications will usually involve arguments and evidence that technical or economic constraints limit the availability of less discriminatory alternatives.

85. Finally, we emphasize that the Commission will closely scrutinize claims of technical or economic feasibility through review of documentation submitted by the entity under investigation, publicly available reports and other information, interviews and depositions of relevant personnel, and other available information. Under the Commission's market modification rules, the Commission created a process for satellite carriers to claim an inability to broadcast in certain locations due to technical and economic feasibility. In practice, the Commission's Media Bureau closely scrutinizes satellite carriers' infeasibility claims under § 76.59 of the Commission's rules. Similarly, in the context of our section 60506 rules, the Commission will not defer to the entity seeking to justify policies and practices alleged to be discriminatory. We will require proof by a preponderance of the evidence that the policy or practice in question is justified by genuine issues of technical or economic feasibility. Stated differently, a covered entity can demonstrate that a policy or practice is justified by genuine issues of technical or economic feasibility by showing that less discriminatory alternatives are not reasonably available and achievable because of genuine technical or economic constraints.

## Prohibition of Digital Discrimination of Access

86. Today we adopt a rule broadly and directly prohibiting "digital discrimination of access" as we have now defined it. Our prohibition thus forbids both intentionally discriminatory conduct (that is, applies a disparate treatment standard) as well as conduct that produces discriminatory effects (that is, applies a disparate impact standard). This approach does not supplant, but rather supplements the Commission's past and ongoing efforts to facilitate broadband access through affirmative approaches.

87. At this time, we find that this broad prohibition and the enforcement mechanisms described below are the most cost effective means to accomplish Congress's stated objectives in section 60506. Prohibiting discrimination in access to broadband service is necessary to facilitate equal access to broadband and prevent digital discrimination of access, and both of these goals are required by the statute. In that same vein, unequal access to broadband service imposes significant costs on unserved and underserved communities, and on the Nation as a whole. The voluntary informal complaint process described below is a low-cost approach toward meeting the statutory requirement that leverages existing Commission systems. Similarly, enforcement of the broad prohibition through self-initiated investigations affords the Commission ample flexibility without substantially overhauling the enforcement process. Such low-cost approaches will allow the Commission to enforce the statute in a cost-effective manner, while bringing the undeniable benefits of expanded broadband access. Lastly, our rules are designed to minimize the compliance- and other-related costs they will likely impose on broadband providers and the other entities our prohibition covers.

88. Fundamentally, a policy or practice will violate our prohibition on digital discrimination of access if it discriminates, either by intent or in effect, based on one of section 60506's listed characteristics. In determining whether a policy or practice violates the prohibition we adopt today, the Commission will look first to whether the policy or practice in question differentially affects access to broadband service or is intended to do so. If that question is answered in the affirmative, the Commission will review any issues of technical or economic feasibility that may compel use of the challenged policy or practice rather than a less discriminatory policy or practice.

In other words, the rules we adopt today require assessment in the first instance of whether a policy or practice is discriminatory; and if so, whether there were reasonably available and achievable alternatives (i.e., alternatives that were technically and economically feasible) that would have been less discriminatory.

89. We disagree with commenters asserting that section 60506 does not authorize a prohibition on private conduct. These commenters variously claim that section 60506, as part of the Infrastructure Act, only obligates the Commission to undertake affirmative-based efforts, e.g., by funding the expansion of covered entities' broadband footprints or by promoting digital skill building or adoption of broadband by consumers through other initiatives outside this proceeding. Congress did not specify the means by which the Commission should fulfill its obligations under section 60506. As explained above, we conclude that the statutory language authorizes the Commission to address and combat both intentional discrimination and disparate impacts. The U.S. Chamber of Commerce contends that the Commission's adoption of "new civil-rights legislation wholesale, including authorization of unfounded deployment mandates or rate regulation," would constitute a violation of the nondelegation doctrine. However, our prohibition today—a narrower action than that complained about—simply fulfills the task Congress, using clear language directing the Commission to prevent digital discrimination of access, gave us to perform. Adoption of these rules does not require an impermissible assumption of Congress's legislative powers; it only exercises the authority the Infrastructure Act conferred under the guidance provided in that statute. A prohibition of the kind we adopt today proves necessary to effectuate this change. It does so by deterring discrimination in the first instance (thereby "preventing" its occurrence) while also enabling the Commission to target behaviors that affirmative-based approaches alone may be insufficient to change.

90. We also disagree with commenters arguing that a broad prohibition against digital discrimination of access will fundamentally transform the current regulatory landscape. As we explain below, our approach, which implements the directive in section 60506, involves self-initiated investigations. Such investigations may be premised on information submitted by the public, communications with state, local, or Tribal officials, or through outreach via

other channels. However, we note that a complaint or allegation alone does not necessarily warrant an enforcement response from the Commission, thus ameliorating any such concerns raised by some commenters. Our prohibition— consistent with the Commission's nondiscrimination requirements associated with its ongoing efforts to promote broadband access—and the enforcement methods we outline below represent an important, yet incremental, step in furthering the Commission's and Congress's digital equity goals.

### Scope of Prohibition

#### Covered Entities

91. We find that the digital discrimination of access rules we adopt today shall apply to entities that provide, facilitate and affect consumer access to broadband internet service. Covered entities include, but are not limited to, broadband providers as defined in rule 54.1600(b), contractors retained by, or entities working through partnership agreements or other business arrangements with, broadband internet access service providers; entities facilitating or involved in the provision of broadband internet access service; entities maintaining and upgrading network infrastructure; and entities that otherwise affect consumer access to broadband internet access service as further discussed below. In the Notice of Inquiry, we sought comment on whose "policies or practices . . . that differentially impact consumers' access to broadband internet access service" should be covered by our definition of digital discrimination of access. We also sought comment on whether we should understand digital discrimination of access by a broader range of entities than broadband providers. To achieve the policy that "subscribers should benefit from equal access to broadband internet access service," and fulfill Congress's directive that the Commission "facilitate equal access to broadband internet access service," we have determined that the rules must include not only broadband providers, but also other entities that provide services that facilitate and affect consumer access. The record supports this determination. We thus find that there are a range of entities that facilitate and can affect consumer access to broadband. Therefore, we find that our rules and, in particular, our prohibition against digital discrimination of access, extend not only to broadband providers, but also to entities that provide services that facilitate and meaningfully affect

consumer access to broadband internet access service.

92. Numerous commenters agree that broadband providers are not the only entities that should be subject to these rules. To be sure, other platforms and organizations affect consumer access to broadband internet access service. For example, Lawyers' Committee for Civil Rights Under Law argues that section 60506 prohibits interference with equal access to broadband by any type of entity because guaranteeing equal access to broadband for all individuals requires applying the statute to any entity that can affect the ability of an individual to access the service, not just those entities that provide connectivity. And as TURN states, as technology evolves, the Commission's rules must be able to address future technological evolutions that may affect or interfere with broadband internet access. Lastly, National Digital Inclusion Alliance and Common Sense Media urge us to apply our rules to any entity—subsidiary, parent company, or other—that provides broadband internet access service.

93. We disagree with arguments that our authority under 60506(b) extends only to providers of broadband internet access service because "only a service provider, and not some other class of entity, can 'offer' a 'service'." As explained below, we believe the definition of "equal access" in section 60506(a), which applies both to section 60506(b)'s mandate that we facilitate equal access and that we prevent digital discrimination of *access*, focuses on consumers' opportunity to receive and effectively utilize an offered service. Conduct by entities other than broadband providers might impede equal access to broadband internet access service on the bases specified in the statute. For example, the Lawyers' Committee for Civil Rights Under Law provides several examples of how entities may impact consumer access based on protected characteristics, including a landlord restricting broadband options within a building even if multiple providers are available. While we reach no conclusion whether this, or other specific examples in the record would be covered by our rules, we are persuaded that there could be situations—now or in the future—in which non-providers could impede equal access to broadband internet access service based on the listed characteristics. Moreover, while we are not explicitly tasked with regulating entities outside the communications industry, section 60506 does require us to facilitate equal access to broadband by "preventing" and identifying steps necessary to "eliminate" digital

discrimination of access. Thus, to the extent that entities outside the communications industry provide services that facilitate and affect consumer access to broadband, they may be in violation of our rules if their policies and practices impede equal access to broadband internet access service as specified in the rules. To the extent that such entities have policies or practices that differentially impact consumers' access to broadband internet access service, we will consider, among other things, the closeness of the relationship between that entity's policies and practices and the provision of broadband service. By way of example, the U.S. Supreme Court long ago upheld the Commission's exercise of jurisdiction over prohibited surcharges imposed by hotels and apartment owners based on arrangements they made with the telephone company, and where the practice was "so identified" with the communications service that it was brought within the prohibition. We also note that section 411(a) provides as follows: "In any proceeding for the enforcement of the provisions of this Act, . . . it shall be lawful to make as parties, in addition to the carrier, all persons interested in or affected by the charge, regulation, or practices under consideration, and inquiries, investigations, orders, and decrees may be made with reference to and against such additional parties in the same manner, to the same extent, and subject to the same provisions as are or shall be authorized by law with respect to carriers."

94. Lastly, we acknowledge that commenters disagree on whether to include infrastructure owners and local governments within the scope of our rules, but we decline to expressly carve out specified entities from the scope of coverage at this time. City of Philadelphia, City of Oklahoma, City of Minneapolis, etc. (Local Governments) argue that not considering infrastructure owners as providers of broadband services subject to our digital discrimination of access rules would allow broadband providers to outsource their deployments to third parties to avoid our equal access rules. WIA disagrees with Local Governments in their assertion that infrastructure owners should be covered by the rules on digital discrimination of access, arguing that doing so would unlawfully expand the Commission's jurisdiction. Additionally, Local Governments request that we not categorize local governments as "covered entities" based on their roles as right-of-way managers

or franchise regulators. While there may be tension in the record as to the role these entities play, our rule is clear that any entity that meaningfully affects access to broadband internet service is subject to our digital discrimination of access rules.

Covered Consumers

95. The definition of digital discrimination of access adopted today includes "policies and practices . . . that differentially impact *consumers'* access to broadband internet access service . . . or are intended to have such differential impact." In the *NPRM*, we sought comment on the meaning of "consumers" and who would fall within the scope of this term. Commenters to the *NPRM* proposed various definitions. We today define "consumers" in this context to mean both current and potential subscribers, which includes individual persons, groups of persons, individual organizations, and groups of organizations having the capacity to subscribe to and receive broadband internet access service. We define "subscriber" as a current recipient of broadband internet access service as defined in § 8.1(b) of the Commission's rules.

96. Consistent with the purposes of section 60506, the term "consumers" as used in our adopted definition of digital discrimination of access comprises current subscribers and prospective subscribers of broadband internet access service. Our rules do not cover other types of broadband service, such as business data services or enterprise customer purchases. And, under this rule, individual or groups of persons, organizations, or businesses fall within the scope of the term "consumer." Covering both current and prospective subscribers is supported for several reasons. First, section 60506's Statement of Policy directs the Commission to "ensure that all people of the United States benefit from access to broadband." As the American Library Association observes, "[t]here are 'people of the United States' who are not subscribers because they experience digital discrimination that precludes them from becoming subscribers." The California Public Utilities Commission further observes that "one cannot count as a subscriber if broadband service is not offered to them in the first place." We agree. We would not be fulfilling our statutory mandate to facilitate equal access to broadband internet access service if we failed to include unenrolled or prospective subscribers as "consumers" under our rules. Second, limiting "consumers" to existing subscribers would do nothing to expand

broadband availability in unserved communities. By way of example, the Japanese American Citizens League expressed that a large number of small businesses in the historic San Francisco Japantown business district remain unconnected to the internet with reliable broadband access. If high-speed broadband service were unavailable in a particular geographic area because of discriminatory conduct, by definition there could be no subscribers in that area. And if the Commission's rules were limited to ensuring equal access by those already subscribing to a service, there would be nothing the Commission could do to investigate the reasons for this lack of access on the part of non-subscribers. Under the argument pressed by certain commenters, the Commission's rules would instead be confined to leveling service quality, pricing and other terms of service as between underserved communities and better-served communities. Such a limitation is not consistent with section 60506's overarching purpose to "ensure that *all people* of the United States benefit from equal access to broadband internet access service."

97. We therefore reject commenters' arguments that the "consumers" covered by our rules should be limited to subscribers. We disagree with NTCA's argument that the Commission's purview is limited to "subscribers," referring to "those who purchase service from the provider." The Commission cannot fulfill Congress's directive to facilitate equal access to broadband internet access service without being able to address the issues that limit the opportunity to subscribe in the first instance. We firmly believe Congress intended the rules implementing section 60506(b) to facilitate the expansion of access of broadband service by eliminating discrimination, not just the leveling of service quality and terms. Therefore, our rules for digital discrimination of access cover all consumers, including both current and prospective subscribers.

98. We also find that, for purposes of our definition of "digital discrimination of access," the term "consumers" includes not only individuals, but also groups of persons, organizations, and businesses. We agree with National Digital Inclusion Alliance and Common Sense Media that digital discrimination of access can manifest differently when it affects a single person, as compared to a group of persons within a community, and either type of discrimination can violate the rules.

99. In the *NPRM*, we sought comment on whether there are practical or administrative costs and benefits to the Commission, industry and those who might suffer discrimination if both persons and organized groups of persons (such as community associations) are covered by our definition. As supported by the comments, we find no significant additional costs in defining "consumers" to include persons and organized groups of persons, as well as groups of organizations. As discussed in the informal complaints section below, we recognize that community associations and other organizations might well submit the majority of informal complaints relating to digital discrimination of access, and we have no concerns on that score.

Listed Characteristics

100. Congress identified six characteristics as bases for digital discrimination of access—income level, race, ethnicity, color, religion, and national origin. In the *NPRM*, we sought comment on whether we should expand our definition to include additional characteristics, such as disability status, age, sex, sexual orientation, gender identity and expression, familial status, domestic violence survivor status, homelessness, and English language proficiency. While some commenters argue we should expand the listed characteristics, others disagree.

101. Based on the language of the statute, we do not add to the listed characteristics of persons protected under the rules that serve as the bases for considering digital discrimination of access. Even though the statute affords protection against digital discrimination of access based on national origin, some commenters urge us to incorporate "limited-English proficiency" (LEP) as an express listed characteristic under the rules. It is well established, however, that discriminating against persons based on their limited-English proficiency can constitute a form of national origin discrimination. Federal agencies have interpreted Title VI's prohibition against national origin discrimination to require that LEP individuals have meaningful access to federally funded programs and activities. This same interpretation as to national origin discrimination has been given under the Fair Housing Act. Congress must be presumed to have deliberately limited the list of protected characteristics in section 60506(b) to income level, race, ethnicity, color, religion, and national origin. While we acknowledge the strong record support for extending the rule to cover persons with other characteristics, federal antidiscrimination laws often vary in terms of the protected classes they cover. For example, many commenters discussed the challenges faced by people with disabilities in securing access to high quality broadband services. For instance, Title VII of the Civil Rights Act protects against discrimination based on "race, color, religion, sex, or national origin," whereas the FHA goes further and includes additional protections for "disability and familial status." Here, Congress chose the six listed, protected characteristics and not others. This does not mean that the legitimate concerns of persons with these additional characteristics is to be minimized. To the contrary, the record is replete with evidence that classes beyond the six listed groups face varying broadband related challenges. We have no discretion to overrule the choice made by Congress in this regard, at least as it applies to our rules implementing section 60506(b). Under section 60506(c)(3), the Commission and the Attorney General can seek to prohibit "deployment discrimination" based on factors other than those listed in that section, based on the record developed in this proceeding. Further, even if not covered by Section 60506(b), people with disabilities may avail themselves of other federal laws governing digital accessibility, such as the Americans with Disabilities Act of 1990 (ADA), the Rehabilitation Act of 1973, and the Twenty-First Century Communications and Video Accessibility Act of 2010 (CVAA).

102. Our work towards ensuring broadband access does not begin or end with this statute. We will continue to address access to broadband under other sources of authority. For example, we have established accessibility protections under other statutory grants that govern the ACP, ECF, and EBB programs. The ACP supports the purchase of broadband access services and connected devices, such as tablets and laptops, and requires them to be accessible. In the Emergency Connectivity Fund Report and Order, the Commission established an expectation that connected laptops be accessible to students, school staff, and library patrons with disabilities to address their remote learning needs. For these connected laptops, school districts have purchased accessibility features such as software providing screen magnification, screen reading functionalities, captioning services, and touchscreens for students with significant fine motor skills difficulties. As we move forward, we will continue to use all the tools at our disposal to ease the digital accessibility divide.

Covered Services

103. For purposes of these rules, we apply the same definition of "broadband internet access service" that appears in § 8.1(b) of the Commission's rules. That definition states: The term "broadband internet access service" means "a mass-market retail service by wire or radio that provides the capability to transmit data to and receive data from all or substantially all internet endpoints, including any capabilities that are incidental to and enable the operation of the communications service, but excluding dial-up internet access service. This term also encompasses any service that the Commission finds to be providing a functional equivalent of the service described in the previous sentence or that is used to evade the protections set forth in this part." We use the terms "broadband," "covered services," and "broadband internet access service" interchangeably.

104. In the *NPRM*, we sought comment on the scope of services that should be covered by our rules. We also specifically sought comment on whether the above-referenced definition of "broadband internet access service" fully captures the scope of technologies relevant to digital discrimination of access. In determining the scope of our definition of digital discrimination of access, we find that the term "broadband internet access service" in that definition has the same meaning given the term in § 8.1(b), and encompasses the range of services that may give rise to digital discrimination of access. In the proposed definition of "digital discrimination of access," the Commission sought comment on whether "covered services" should be limited to broadband internet access service. No commenter opposed using this definition of "broadband internet access service." We find that the straightforward and well-established definition best delineates the scope of covered services under the rules we adopt today.

105. Moreover, the record reflects strong support for adopting § 8.1(a)'s definition. As Local Governments notes, including all types of broadband providers is consistent with the *Restoring Internet Freedom Order*, 80 FR 19737, which found that the term "broadband internet access service" includes "services provided over any technology platform, including but not limited to wire, terrestrial wireless (including fixed and mobile wireless services using licensed or unlicensed spectrum), and satellite." Providers can use various forms of technology to provision broadband to consumers,

including digital subscriber line (DSL), cable modem, fiber, fixed and mobile wireless, and satellite. By incorporating the established meaning of "broadband internet access service" in the definition of "digital discrimination of access," we ensure that our rules accurately reflect the scope of services that may give rise to instances of digital discrimination of access and thus fulfill the Congressional direction in section 60506 to facilitate equal access to broadband internet access service and prevent digital discrimination of access.

Covered Elements of Service

106. The rules we adopt today apply to any lack of comparability in service quality, as indicated by the metrics specifically listed in the statutory definition of "equal access" as well as any "other quality of service metrics in a given area," and to any lack of comparability in terms and conditions of service, including but not limited to price. We find this scope of coverage to be consistent with section 60506's statutory text and necessary to effectuate its purpose.

107. In broadly applying our rules to all relevant service quality metrics and all terms and conditions of service, we note that Congress directed the Commission to facilitate equal access to the entirety of broadband internet service, not to certain elements of such service. Congress defined "equal access" in section 60506's statement of policy to mean that consumers have "the equal opportunity to subscribe" to broadband internet access service with "comparable speeds, capacities, latency, and other quality of service metrics in a given area, for comparable terms and conditions[.]" As many commenters explain, the inclusion of "other quality of service metrics" and "comparable terms and conditions" in the definition of "equal access" reflects Congressional intent and authorization that the Commission's digital discrimination of access rules cover any aspect of broadband internet access service that impedes, impairs or denies "equal access" to that service.

108. The aspects of service that could affect a consumers' ability to receive and effectively utilize broadband internet access service include, but are not limited to, deployment, technical terms and conditions of service, such as policies and practices regarding speeds, capacities, latency, data caps; network infrastructure deployment, network reliability, network upgrades, network maintenance, customer-premises equipment, and installation; as well as non-technical terms and conditions of service, such as policies and practices

regarding contractual terms generally, mandatory arbitration clauses, pricing, deposits, discounts, customer service, language options, credit checks, marketing or advertising, contract renewal, upgrades, account termination, transfers to another covered entity, and service suspension. Moreover, in order to fully effectuate the goals of section 60506, we find that our rules must cover both actions and omissions, whether recurring or a single instance, concerning these aspects of service, that defeat comparability of service quality, terms, and conditions.

109. We find that adopting a broad definition of covered elements of service is both consistent with the language of section 60506 and necessary to fulfill its purpose. First, by including the catch-all language "and other quality of service metrics in a given area," Congress expressly authorized the Commission to supplement the listed elements of service to include all measurable quality-of-service elements that could affect consumers' ability to receive and effectively utilize broadband internet access service. As the record reflects that policies and practices relating to an array of technical and non-technical aspects of service can affect a consumer's ability to access broadband, a definition with a narrower scope could lead to the Commission's rules failing to cover some aspects of service that result in digital discrimination of access. Consequently, we agree with Lawyers' Committee for Civil Rights Under Law that adopting a flexible approach is necessary "to capture the long tail of intangible variables that are difficult to list exhaustively and are subject to change." Second, our definition provides us with the advantage of flexibility, which will "future proof" our rules as technologies, policies, and practices change over time. For these reasons, we reject the argument that by including certain quality of service metrics in 60506(a)(2), Congress foreclosed consideration of other measurable elements of service quality in evaluating whether equal access has been achieved.

110. We reject arguments that we should limit the scope of covered elements of service to deployment practices or technical terms of service, or that we exclude certain terms, such as pricing. We are persuaded that Congress intended for the Commission's rules implementing section 60506(b) to cover more than deployment practices. As noted above, Congress directed the Commission in section 60506(b) to adopt rules to facilitate equal access to broadband internet access service,

including "preventing digital discrimination of access" and identifying necessary steps for the elimination of such discrimination. By contrast, in section 60506(c), Congress directed the Commission and the Attorney General to ensure that federal policies prohibit "deployment discrimination" based on the income level of an area, the predominant race or ethnicity of an area, or other factors the Commission determines to be relevant based on the record in this proceeding. Had Congress wished to limit the scope of section 60506(b) to "deployment discrimination," it would have done so explicitly. The use of two different terms ("digital discrimination of access" and "deployment discrimination") in adjacent subsections of a one-page section of the statute clearly indicates that Congress intended the two terms to have different meanings. Further, Congress was well aware that factors other than initial deployment of the necessary network infrastructure, such as network upgrades and maintenance at an absolute minimum, affect the ability of consumers to effectively utilize broadband internet access service. Given that the definition of "equal access" expressly includes "quality of service metrics" that are determined by such network upgrades and maintenance, we cannot accept that Congress intended to limit section 60506(b)'s reach to broadband deployment. Such an interpretation would defeat the purpose of the statute.

111. Finally, regarding the inclusion of pricing within the scope of our rules, we find that the statutory language encompasses discriminatory pricing. We emphasize that the rules we adopt today do not set rates for broadband internet access service and are not an attempt to institute rate regulation. Once again, section 60506(b) directs us to "adopt final rules to facilitate equal access to broadband internet access service," and "equal access" is defined in section 60506(a)(2) as the equal opportunity to subscribe to an offered service that provides comparable quality of service "*for comparable terms and conditions.*" (emphasis added). We are unpersuaded by the arguments of commenters that pricing is not included (or includable) in the terms and conditions that must be "comparable" under the statutory definition of equal access. Indeed, pricing is often the most important term that consumers consider when purchasing goods and services across the Nation's economy. We find this is no less true with respect to broadband internet access service. Consequently, we do not believe it was necessary for

Congress to specifically reference pricing in the definition of "equal access" because the most natural reading of "terms and conditions" includes pricing. Moreover, it would be odd for Congress to direct the Commission to consider technical and economic feasibility and have our rules not allow any consideration of differential pricing when analyzing a digital discrimination of access claim. The Commission need not *prescribe* prices for broadband internet access service, as some commenters have cautioned against, in order to determine whether prices are "comparable" within the meaning of the equal access definition. The record reflects support for the Commission ensuring pricing consistency as between different groups of consumers. We also find that the Commission is well situated to analyze comparability in pricing, as we must already do so in other contexts. For example, we analyze the "lowest corresponding price" in the universal service context and conduct the Urban Rate Survey, both of which require comparing the prices that covered entities charge different groups of customers for broadband. We find that the "terms and conditions" covered by the "equal access" definition in section 60506(a) includes pricing terms and conditions, and that "digital discrimination of access" therefore includes discrimination with regard to such pricing.

112. We also reject Verizon's argument that our rules cannot apply to policies and practices that occur after a customer subscribes to broadband internet access service. Verizon argues that the definition of "equal access" limits the scope of our rules to policies and practices affecting only the "opportunity to subscribe" to broadband service *in the first instance*. In other words, Verizon argues that our rules can only address policies and practices concerning the consumer's ability to sign up for service (*i.e.*, contract formation), but cannot address whether the service is actually rendered on equal terms (*i.e.*, contract performance). We disagree with this interpretation. We acknowledge that the definition of "equal access" in section 60506(a) refers to the "equal opportunity to *subscribe* to an offered service . . . ." But we find the word "subscribe" in this context means more than simply signing up for service. It refers, instead, to the ability to receive and effectively utilize the service so as to allow full participation in the social, educational, political and economic life of our Nation. The Statement of Policy

in section 60506(a) says that "subscribers should *benefit* from equal access to broadband internet access service" and that "the Commission should take steps to ensure that all people of the United States *benefit from*" such equal access. There is little or no benefit to be derived simply from having the opportunity to sign up for broadband service if the covered entity can freely engage in discriminatory policies and practices with regard to the ongoing provision of that service. Rather, the potential social, educational, political and economic benefits flow from having the opportunity to receive the service and effectively utilize it. We find that interpreting section 60506 in the cramped manner urged by Verizon is flatly inconsistent with Congress's goal of expanding access to broadband internet access service. We therefore reject that interpretation.

### Revising Commission's Informal Consumer Complaint Process

113. We adopt the proposals in the *NPRM* to revise our informal consumer complaint process to: (1) add a dedicated pathway for digital discrimination of access complaints; (2) collect voluntary demographic information from filers who submit digital discrimination of access complaints; and (3) establish a clear pathway for organizations to submit digital discrimination of access complaints. Subsection 60506(e) requires that the Commission "revise its public complaint process to accept complaints from consumers or other members of the public that relate to digital discrimination." Currently, consumers use the Commission's Consumer Complaint Center to file informal complaints. The Commission's informal consumer complaint process, administered by the Consumer and Governmental Affairs Bureau, is a long-standing, free and efficient way for consumers to raise issues with their service providers and bring problems to the attention of the Commission. The FCC's informal consumer complaint process facilitates a conversation between the consumer and their provider to address the consumer's issues. The consumer complaint process does not involve arbitration, mediation, or investigation. The collective data received from informal consumer complaints help the Commission monitor what consumers are experiencing and inform our policy and enforcement work. In adopting our proposed changes to our informal consumer complaint process, we implement subsection 60506(e).

114. We agree with the majority of commenters who assert that consumers should have an easily accessible complaint process. Such a process will not only benefit consumers in filing complaints related to digital discrimination of access but will also assist the Commission in monitoring what consumers are experiencing, identifying trends, and informing potential policy determinations or enforcement. We note that the Commission's Consumer Complaint Center is responsive on mobile devices and that the FCC's call center is staffed by both English and Spanish speaking agents who can file complaints on behalf of consumers. Individuals who use videophones and are fluent in American Sign Language (ASL) may call the Commission's ASL Consumer Support line for assistance in ASL with filing informal complaints or obtaining consumer information. Consistent with our current process and procedures, consumers may also file complaints via the Consumer Inquiries and Complaint Center, as well as by fax and postal mail.

115. We thus disagree with commenters who argue that our proposed informal complaint process changes would impose undue burdens on covered entities. Our proposed changes do not alter the existing informal complaint process. Rather, our proposed changes make it easier for consumers to file informal complaints related to digital discrimination of access, as mandated by Congress, and allow the Commission to better analyze such complaint data. Indeed, Commission experience with the dedicated pathway for ACP complaints has demonstrated the utility of such a dedicated pathway.

116. We also disagree with the International Center for Law & Economics, which argues that the Commission should implement a legal "standing" requirement for filing informal complaints. The Commission's informal consumer complaint process is designed specifically to provide consumers with a simple and efficient way raise concerns and file complaints with the Commission without complicated legal procedures, filing fees, or other burdensome requirements. The Commission does not currently impose any standing requirements for filing informal consumer complaints. Adopting a standing requirement specifically for digital discrimination of access issues with the Commission would, in effect, thwart a consumer's ability to do so. Such an outcome would be contrary to the express language of section 60506.

*Dedicated Pathway for Digital Discrimination of Access Complaints*

117. We adopt our proposal to add a dedicated pathway for digital discrimination of access complaints. This dedicated pathway will provide digital discrimination informational content in the Consumer Complaint Center to educate consumers about digital discrimination and to provide clear instructions to consumers on how to correctly file a digital discrimination complaint. Consumers will be able to submit their digital discrimination of access complaints through the Consumer Inquiries and Complaint Center. They will be required to choose an issue that best describes their complaint and include a narrative with pertinent details. These complaints will be reviewed and processed. If the consumer submits a complaint alleging digital discrimination of access by a covered entity, the complaint will be forwarded to the appropriate covered entity for investigation and the Commission may set a due date for the covered entity to provide a written response to the informal complaint to the Commission, with a copy to the complainant. Complaint information will be reviewed internally to inform policy and shared internally, when appropriate, for potential enforcement. In addition, we note that the Commission's established administrative processes and procedures afford the Enforcement Bureau access to all consumer complaint data that is submitted through the Consumer Inquiries and Complaint Center. The record in this proceeding reflects widespread support for establishing such a pathway. We agree with commenters that adding a dedicated pathway will increase both the accessibility and efficiency of the complaint process. We direct the Consumer and Governmental Affairs Bureau to implement this dedicated pathway and, in coordination with the Wireline Competition Bureau, to monitor complaints submitted through this pathway to assist in the formulation of future policy and consumer education initiatives.

118. We also agree with those commenters who stress the need to educate consumers on the issue of digital discrimination of access and the complaint process associated with such complaints. We direct the Consumer and Governmental Affairs Bureau, in coordination with the Wireline Competition Bureau, to develop materials to educate consumers on digital discrimination of access and on

how to file complaints via the dedicated pathway.

119. *Need for Dedicated Pathway.* We find that our informal consumer complaints process provides the best opportunity for consumers to inform the Commission of digital discrimination of access issues. The informal complaint process requires no complicated legal procedures, has no filing charge, and does not require the complaining party to appear before the Commission, making it an easy and efficient method for consumers to bring issues to the Commission's attention. The Commission reviews informal consumer complaints and, when applicable, will identify trends and share information internally in furtherance of our enforcement and consumer protection efforts. As the Commission takes seriously its enforcement obligations, we direct the Enforcement Bureau, in coordination with the Consumer Governmental Affairs Bureau and the Wireline Competition Bureau, to expeditiously investigate potential violations and enforce our rules using the Commission's traditional enforcement mechanisms.

*Voluntary Demographic Information Collection*

120. We adopt our proposal to collect voluntary demographic information from filers who submit digital discrimination of access complaints. We note that the statute requires the Commission to "prevent[ ] digital discrimination of access based on income level, race, ethnicity, color, religion, or National origin[.]" We find that collecting minimal, voluntary demographic information from individuals filing complaints may enable us to identify and understand some underlying patterns of digital discrimination of access that might not otherwise be apparent from the substance of the complaints, thus increasing the utility of the informal complaint process as it relates both to policy development and enforcement. We agree that this collection should be voluntary on the part of the complainant and direct the Consumer and Governmental Affairs Bureau to make clear that this information is not required in order to submit a digital discrimination of access complaint, that the provision of such information will not affect the submission or processing of the complaint, why this information is being collected, how it will be used, and how it will be maintained by the Commission. We note that the Commission's use and disclosure of such information will be subject to the applicable System of Records Notice

(SORN) governing our informal complaints system, which the Commission will modify, if necessary, based on this *Report and Order.*

121. We disagree with WISPA that providing demographic information should be mandatory. We are concerned that requiring this information may deter consumers from filing complaints. Because the purpose of our changes is to encourage consumers to file informal complaints when they believe our rules may have been violated, we find that the potential deterrence effect from requiring such information outweighs any potential benefit from making the provision of such information mandatory.

### Pathway for Organizations To Submit Digital Discrimination of Access Complaints

122. We adopt our proposal to establish a clear pathway for organizations to submit digital discrimination of access complaints. We agree with commenters that allowing community partners and third-party organizations to file informal complaints on behalf of consumers (individuals or groups of individuals) will enable the Commission to better identify substantive complaints and collaborate with state, local and Tribal governments when addressing such complaints. We also agree with commenters such as the National League of Cities that allowing third parties to file on behalf of consumers will improve access to our informal complaint process for those with language barriers, limited digital skills, and/or limited access to devices or connectivity. Improving access to our informal complaint process serves both as an important safeguard for marginalized communities and as a means of ensuring that our complaint data is complete and accurate.

123. We disagree with commenters who suggest that third-party filers should be subject to more burdensome procedural or evidentiary standards. We find that the benefits of promoting and enhancing access to our informal complaint process far outweigh the limited risks outlined by the commenters. We agree with Public Knowledge that one of our primary goals is to "further enable marginalized communities to be represented through the complaint process" and that "to throw up additional barriers would undermine this goal."

124. *Making Available Anonymized Complaint Data.* We adopt our proposal to make anonymized or otherwise de-identified complaint data available to the public. We direct the Consumer and

Governmental Affairs Bureau, in coordination with the Wireline Competition Bureau, the Office of Economics and Analytics, and the Office of General Counsel, to periodically make publicly available anonymized or otherwise de-identified digital discrimination of access complaint data. The record in this proceeding reflects widespread support for this proposal. We agree with commenters that such data would be useful to third parties in conducting research, advocacy, and reporting, and we find that these data can be released without compromising the privacy of individual complainants. We find that public release of anonymized or otherwise de-identified data would also promote transparency and empower third parties to assist the Commission in identifying trends in digital discrimination of access.

### Enforcement

125. We find that effective implementation of section 60506 requires use of the Commission's traditional enforcement mechanisms to fulfill Congress's mandate that the Commission prevent and identify necessary steps to eliminate digital discrimination of access. This includes the full gamut of the Commission's enforcement toolkit, which ranges from letters of inquiry to remedial orders to forfeiture proceedings. Alleged or otherwise apparent instances of digital discrimination of access will be investigated on a self-initiated basis. This approach, which affords the Commission necessary flexibility for tackling Congress's directives, will involve data gathering via complaints and allegations made through the Commission's informal complaint process by state, local, and Tribal officials, and via other sources.

126. As explained above, a policy or practice will violate our prohibition on digital discrimination of access if it discriminates, either by intent or in effect, based on one of section 60506's listed characteristics. In examining policies and practices, the Commission will look to whether the policy or practice in question differentially affects access to broadband internet access service or is intended to do so. If yes, then the Commission will look to whether less discriminatory options were available. Thus, the rules we adopt today involve a twofold assessment: first, whether a policy or practice is discriminatory; and if so, whether there were reasonably available and achievable alternatives (*i.e.*, alternatives that were technically and economically

feasible) that would have been less discriminatory.

### Legal Authority

127. In the *NPRM*, we sought comment on how the Commission should enforce any such rules we might adopt, including by use of our existing "enforcement toolkit of letters of inquiry, notice of apparent liability, and forfeiture orders." We further sought comment on any limitations thereon, highlighting a dispute among commenters about the legal authority underlying the use of these enforcement mechanisms. We conclude that these same tools may be used to enforce the rules we adopt today pursuant to section 60506. Implementing the statute's directives necessitates use of these tools and processes, which will facilitate Congress's and the Commission's goal of facilitating equal access by preventing digital discrimination of access and identifying means to eliminate such discrimination.

128. We find that subsection (b)(1) and (e) under section 60506 provide the Commission express authority to enforce its mandates using the Commission's normal suite of enforcement mechanisms. Section 60506 directs the Commission to adopt final rules to "prevent[ ] digital discrimination of access," and to "identify[ ] necessary steps" for eliminating such discrimination. Use of the words "prevent" and "eliminate" is unusual in the context of a federal anti-discrimination statute. Congress usually adopts a statutory prohibition on the types of discrimination it seeks to address, then tasks the relevant administrative agency with implementing the prohibition through agency rules. As discussed in prior sections of this Order, the words "prevent" and "eliminate" constitute strong medicine and represent a broad mandate for the Commission to take the necessary measures to fully eradicate digital discrimination of access. Moreover, a prohibition without enforcement cannot reasonably be expected to affect conduct in a meaningful way. Indeed, various commenters have identified the use of existing Commission enforcement mechanisms as necessary tools for ensuring compliance with our rules. Others contend that without the use of such tools, section 60506 could not function as Congress intended. Similarly, there would be little point for Congress to direct the Commission to accept complaints of digital discrimination of access if we lacked any of our traditional powers to act on them. The existing "public complaints

process'' serves the agency's general authority to enforce the Communications Act, so we interpret the mandate in subsection (e) to reflect Congress's intent that the agency enforce digital discrimination complaints under the Act's general enforcement provisions.

129. However, some commenters argue that the Commission lacks authority, both under the Communications Act and section 60506, to enforce any rules prohibiting digital discrimination of access. They argue that because Congress did not expressly incorporate section 60506 into the Communications Act, any remedies or enforcement mechanisms found in the Communications Act are unavailable, and section 60506 does not authorize the use of such enforcement tools. AT&T, for example, argues that Congress's decision to "keep [s]ection 60506 out of the Communications Act and to avoid cross-references between it and Title V" reflects Congress's desire to make enforcement by traditional mechanisms unavailable. CTIA similarly observes that unlike other provisions of the Infrastructure Act, such as section 60502, Congress did not explicitly enable the Commission to "impose forfeiture penalties under [s]ection 503 of the Communications Act" in section 60506, rendering those tools unusable.

130. We disagree with those asserting that section 60506 does not authorize the use of the Commission's existing enforcement mechanisms. Congress's decision not to incorporate section 60506 into the Communications Act does not suggest that it contemplated only voluntary compliance with rules designed to "prevent" digital discrimination of access. Although some commenters argue that Congress implicitly or indirectly incorporated section 60506 into the Communications Act, we need not rely on such arguments to justify our approach. Rather, we agree with commenters asserting that section 60506, standing alone, authorizes the Commission to adopt or amend enforcement rules deemed necessary to facilitate equal access and prevent digital discrimination of access, including the use of the Commission's existing enforcement mechanisms.

131. As discussed above, section 60506 authorizes the Commission to incorporate both disparate treatment and disparate impact standards in its definition of digital discrimination of access and, consequently, to adopt rules prohibiting covered entities from engaging in such practices. Contrary to arguments that section 60506 tasks the

Commission with "facilitat[ing] equal access" by way of funding providers' deployment efforts, the statute expressly commands the Commission to *prevent* digital discrimination of access. That is, Congress tasked the Commission with adopting rules that would curb digital discrimination of access before its occurrence. Even had Congress tasked the Commission only with implementing a statutory prohibition on digital discrimination of access (a mandate that would be less broad than the one we were given), the Commission could not do so merely through suggestion. We are aware of no instance in which a federal anti-discrimination law is without any enforcement mechanism whatsoever. Industry fails to explain how "affirmative-based approaches," like funding opportunities, would effectively implement our mandate to "prevent" digital discrimination of access. No commenter suggests that the solution to digital discrimination of access, as we have defined it, requires directing more funds to the entity responsible for such conduct. Indeed, others call such a result absurd. Because preventing digital discrimination of access requires some kind of "stick" in addition to "carrots," it would render much of section 60506 a "nullity" were the Commission to interpret the statute to preclude enforcement of our rules implementing section 60506.

132. We find that section 60506 provides the Commission authority to enact such rules as are necessary to fulfill its statutory obligations— including, for example, amendment or readoption of our existing enforcement rules in the specific context of digital discrimination of access. Section 60506(b) directs the Commission to "adopt final rules to facilitate equal access to broadband internet service . . . including . . . preventing digital discrimination of access . . . ." And as we explain above, our enforcement tools are indispensable in fulfilling this mandate. Section 60506 therefore authorizes the Commission to adopt, readopt, or amend enforcement-related rules as necessary to accomplish this task.

133. Finally, we find that section 4(i) of the Communications Act provides the Commission ancillary authority to carry out its statutorily mandated duties under section 60506, including enforcement of a prohibition on digital discrimination of access. Section 4(i) provides that "[t]he Commission may perform any and all acts, make such rules and regulations, and issue such orders . . . . as may be necessary in the execution of its functions." Effective

enforcement rules are reasonably ancillary to the Commission's statutorily mandated responsibility to combat discrimination in providing access to broadband service. Arguments to the contrary highlight that section 60506 does not fall within the scope of the Communications Act and that its mandate lacks a limiting principle. But as TechFreedom acknowledges, section 4(i) enables the Commission to carry out duties conferred by Congress outside those outlined in the Communications Act. And as explained above, contrary to claims that use of its ancillary authority in this instance would release the Commission " 'from its congressional tether' " or would "exceed the bounds of its statutorily[ ] delineated authority," the Commission's establishing and enforcement of today's prohibition logically extends from and satisfies Congress's mandate of preventing digital discrimination of access.

134. We note that the enforcement measures and final rules that we adopt today do not represent all that the Commission can—and must—do to combat digital discrimination of access. As noted above, section 60506(b) directs the Commission to adopt "final rules" to: (1) prevent digital discrimination of access and (2) identify necessary steps for the Commission to take to eliminate such discrimination. We interpret Congress's directive with respect to "eliminating" digital discrimination of access to include steps not taken in our implementing rules that might ultimately be necessary to ensure that such discrimination does not occur after the effective date of our rules. Congress has tasked us to identify any such "necessary steps" so they can swiftly be undertaken if and when determined to be necessary, and so Congress can consider what additional statutory authority, if any, might be necessary to allow for full achievement of the equal access goal. We believe the rules we adopt today, coupled with the affirmative requirements proposed in the *Further Notice of Proposed Rulemaking*, FCC 23–100, released November 20, 2023, (*Further Notice*), represent the measures necessary both to "prevent" and "eliminate" digital discrimination of access in the future. As such, we find our actions today satisfy the Commission's obligations under section 60506(b)(1) and, at a minimum, takes initial steps towards addressing our obligations under section 60606(b)(2).

135. We disagree with those asserting that enforcement of our prohibition raises a major-questions-doctrine issue. As explained below, the Commission's

self-initiated investigation process does not reflect a substantial overhaul of the Commission's enforcement mission. Nor does taking this step, modest in comparison to the concerns raised by some commenters, risk fundamentally altering the landscape of the telecommunications industry. As employers, covered entities should be familiar with the standards and processes for establishing liability under Title VII of the Civil Rights Act of 1964, and many of these entities must already comply with the nondiscrimination requirements associated with the receipt of federal funds. Moreover, the Commission does not find in section 60506 an "elephant[ ] in a mousehole" as some commenters argue. To the contrary, Congress here explicitly called on the Commission to prevent and identify necessary steps to eliminate digital discrimination of access. It mandated, using clear language, that the Commission adopt rules necessary for doing so. Our adoption of a prohibition on digital discrimination of access is directly responsive to Congress's charge, and our use of the Commission's enforcement mechanisms a necessary component of those efforts.

136. At the same time, we do not agree with some commenters' suggestion that section 60506(b)(2) represents a broad grant of authority to the Commission to require covered entities to undertake remedial measures to eradicate the effects of conduct predating the effective date of our rules. While section 60506(b)(2) authorizes the Commission to "identify" the steps necessary to eliminate the discrimination identified in subsection (b)(1), it does not, in our view, constitute a clear grant of authority to impose retroactive liability on industry participants. Moreover, we note that determining when and where digital discrimination of access occurred across the country in the past, how to remedy such discrimination, and how to assign and allocate the cost of such remediation, would represent highly time- and resource-intensive undertakings. We will not presume that Congress intended for the Commission to undertake these highly complex tasks without clear evidence to that effect. Accordingly, for purposes of implementing section 60506(b), we will train our focus on preventing—and thus eliminating—digital discrimination of access occurring after the effective date of our rules.

### Amending Commission Rules

137. We amend some of our existing enforcement rules today to enshrine the processes by which the Commission

will undertake investigations of claims of digital discrimination of access. These include changes to Rule 1.80, which details our forfeiture procedures, so that it will now reference the provisions of section 60506 in addition to those of the Communications Act and other statutes. Rule 1.80, which acts as our implementing rule for forfeiture proceedings, states that a forfeiture penalty may be assessed against any person found to have violated either designated provisions of the Communications Act (and rules related thereto); Title 18 of the United States Code; or section 6507 of the Middle Class Tax Relief and Job Creation Act of 2012, as well as rules, regulations, and orders promulgated thereunder. Additionally, Rule 0.111 will now reflect the Enforcement Bureau's direction to investigate claims of digital discrimination of access and make recommendations as to potential violations and penalties. We adopt these amendments pursuant to the authority expressly granted to the Commission in section 60506(b).

### Enforcement Framework

138. The Commission will launch investigations into complaints and allegations of digital discrimination of access on a self-initiated basis and, where the Commission determines a violation has occurred, pursue remedies and penalties. Investigations may stem from complaints filed through the informal complaint process or information otherwise brought to the Commission's attention. As outlined above, the Commission will adopt a dedicated pathway for accepting digital discrimination of access claims from the public. Additionally, the Commission may receive allegations of digital discrimination of access from state, local, or Tribal governments. And as proposed in the *Further Notice*, the Commission may in the future obligate covered entities to make filings to the Commission as part of their affirmative obligations to assist in combating digital discrimination of access,[2] filings that similarly might serve as a basis for investigation. Irrespective of the origin of such complaints and information, the Commission will—at its discretion— determine whether investigation by the agency is warranted and whether further response from the entities alleged to have violated our rules will be required. However, we recognize that broadband providers and other covered entities may need time to review their policies and practices in light of the rules we adopt today. Accordingly, we will not

initiate any enforcement investigation solely concerning conduct that produces differential impacts under these rules until at least six months after the effective date of the rules.

139. The Commission will conduct its investigations of digital discrimination of access complaints and allegations consistent with federal law and in a manner consistent with the processes and procedures followed by other federal agencies. Taking this approach ensures alignment with civil rights models, as suggested by some commenters. In investigating complaints and allegations of digital discrimination of access, we adopt the legal standards for proving discriminatory treatment and disparate impact set out below and in our discussion above of disparate impact and disparate treatment standards as they relate to our definition of digital discrimination of access.

140. *Investigating complaints alleging that a policy or practice is intended to differentially impact consumers' access to broadband internet access service on a prohibited basis.* Direct evidence of discriminatory intent is rare. For that reason, intentional discrimination is typically proven by circumstantial evidence. The two legal standards for reviewing circumstantial evidence of intentional discrimination are set out in *Vill. of Arlington Heights* v. *Metro. Housing Dev. Corp.,* 429 U.S. 252, 266 (1977) (*Arlington Heights*) (providing the framework for analyzing whether facially neutral policies or practices are motivated by discrimination) and *McDonnell Douglas Corp.* v. *Green,* 411 U.S. 792 (1973) (*McDonnell Douglas*) (providing the framework for allocating proof for claims of disparate treatment discrimination). Federal agencies historically have used two chief legal frameworks in evaluating whether circumstantial evidence supports an inference of discriminatory intent, depending on the nature of the alleged discrimination. We will investigate complaints of intentional discrimination under these frameworks.

141. *When a facially neutral policy or practice is allegedly motivated by discrimination: Arlington Heights standard.* The *Arlington Heights* framework applies when an otherwise facially neutral policy or practice is allegedly motivated by discrimination. Under this framework, as applied in the context of section 60506, the Commission, as factfinder, will evaluate a variety of factors that contributed to the adoption, use or application of the challenged policy or practice in order to determine discriminatory intent. The non-exhaustive list of evidentiary factors include: background of the

---

[2] *Infra* para. 175.

challenged policy or practice; sequence of events leading up to the challenged policy or practice; departures from normal, procedural sequence (how the challenged policy or practice occurred and was decided on by decisionmakers); pattern of actions that impose greater harm on persons in protected groups (*i.e.,* whether a practice bears more heavily on minority or low-income persons) and awareness of the greater harm (*i.e.,* whether the harm to members in the protected groups was foreseeable to decisionmakers). Where it is determined that the policy or practice was intended to discriminate, the agency evaluates whether the adoption, use or application of the policy or practice would have occurred absent the discrimination. Importantly, evidence of statistical disparity, alone, generally will not satisfy this standard. In the context of section 60506, this approach would likely be most applicable to complaints involving treatment of a large group of persons, including but not limited to deployment, upgrade, and large-scale service matters alleged to have been motivated by prohibited discrimination. The Commission will find a violation of the digital discrimination of access rules where, upon close evaluation of *Arlington Heights* factors, (1) persons in a protected group were denied equal access to broadband internet access services, (2) the challenged conduct would not have occurred absent the discrimination, and (3) the policy or practice in question is not justified by genuine issues of technical or economic feasibility, as outlined above.

112. *When policies or practices are intended to impact persons within the protected group differently than similarly situated persons: McDonnell Douglas standard.* This framework applies when a policy or practice is intended to treat similarly situated persons differently because of a protected status. It is typically utilized when investigating complaints involving a smaller, discrete number of complainants and where there are identifiable comparators. In the context of our rules implementing section 60506, this framework may be utilized for investigating complaints as to selection for benefits, special deals, or even qualification for broadband service.

113. The Commission will investigate three elements under this framework: (1) whether there is differential treatment of similarly situated persons: This element is shown with evidence that persons are within a protected group; they were eligible for service; were treated in an adverse manner; and

that persons similarly situated, but not in the protected group, received better treatment. (2) whether there is a legitimate, technical or economic justification for such differential treatment: This element will be investigated by the Commission, and any explanation must be clear and reasonably specific, and fully support a showing that there was a "legitimate, nondiscriminatory reason for the different treatment." And, if so, (3) whether the technical or economic justification for the differential treatment is actually a pretext for prohibited discrimination. Under this element, the Commission will investigate whether any reason given for the challenged action was pretext for discrimination. Under this element, the Commission may weigh whether the reasons given were true; any weaknesses, implausibility, inconsistency or contradictions; and if action taken was contrary to written policy or practice, or was a post-hoc fabrication. As to the second element, the Commission will weigh all available evidence bearing on whether the challenged policy or practice is justified by genuine issues of technical or economic feasibility. The Commission will find a violation of the digital discrimination of access rules where persons in a protected group were treated differently, and (1) there is no legitimate technical or economic justification for the difference in treatment, or (2) the proffered technical or economic justification is determined to be pretext for discrimination.

114. *Investigating allegations that policies and practices differentially impact consumers' access to broadband internet access service on a prohibited basis.* We expect most investigations of possible violations of our rules to concern credible allegations that specific policies or practices have meaningful discriminatory effects and are not justified by genuine issues of technical or economic feasibility. We adopt the elements of proof for disparate impact as established in *Inclusive Communities* in a way that comports with section 60506 and the Commission's investigatory process. Thus, investigations concerning allegations that facially neutral policies or practices have discriminatory effects will involve: (1) the identification of a policy or practice that is causing a disparate impact on a prohibited basis; (2) assessment of whether the policy or practice in question is justified by genuine issues of technical or economic feasibility; and (3) a determination of whether there were reasonably

achievable, less discriminatory alternatives. If the Commission determines that a covered entity's policy or practice differentially affects access to broadband service on a prohibited basis and that a less discriminatory alternative was reasonably available and achievable, the policy or practice in question will not be deemed justified by genuine issues of technical or economic feasibility.

145. Under the first element of our disparate impact analysis, the Commission will investigate whether an identified policy or practice of the covered entity is causing the discriminatory effect. We will also investigate the nature of the disparate impact that is being complained about or otherwise brought to our attention. As explained above, we will rely on information provided by the covered entity as well as specified data sources and, where necessary, statistical analyses to assess the extent of the differential impact on access to broadband internet access service. The Commission recognizes that any such differential impact on broadband access must be caused by a specific policy or practice of the entity under investigation.

146. Under the second element of our disparate impact analysis, the Commission will determine whether genuine issues of technical or economic feasibility support and give substantial, legitimate justification for the policy or practice that is being investigated. Third, the Commission will determine whether a less discriminatory alternative policy or practice was reasonably available and achievable and identify any such alternative policy or practice determined to have been reasonably available and achievable. If such an alternative was available to the covered entity, the policy or practice causing the differential impact will not be deemed justified by genuine issues of technical or economic feasibility, and the covered entity will be exposed to liability for digital discrimination of access. Under the Commission's investigative process, the factual and legal bases for any proposed liability determination are set forth in a notice of apparent liability and the respondent has an opportunity to respond to that notice before any final liability determination is made.

147. *Remedies.* Remedying violations of our prohibition on digital discrimination of access will depend on the context and extent of the violation. This requires that remedies be established on a case-by-case basis. To this end, the Commission will bring to bear its full suite of available remedies,

including the possibility of monetary forfeitures.

148. We adopt a presumption of compliance for policies and practices that are in compliance with specific program requirements for the Broadband Equity, Access, and Deployment (BEAD) and Universal Service Fund (USF) high-cost programs. As noted below, we will consider whether other presumptions or safe harbor defenses are warranted going forward, including safe harbors or presumptions of compliance for policies and practices that comply with other federal broadband deployment programs that embody similar equity and nondiscrimination principles. These programs exist to remedy current inequities in broadband deployment and are consistent with section 60506 and our rules adopted today to facilitate equal access to broadband internet service. We will also consider a presumption of compliance for future broadband funding programs that account for digital discrimination of access rules. We decline to expand, however, presumptions or safe harbor defenses beyond these funding programs as some commenters urge. Although T-Mobile correctly identifies that the Commission must take into account issues of technical and economic feasibility, we disagree that for section 60506's language to have "real meaning," the Commission must establish particular safe harbor defenses at this time. The approaches outlined above prove sufficient for protecting the rights of industry participants, and we do not expect that the Commission's self-initiated approach to investigations will inundate industry participants with meritless claims that they must expend substantial resources defending against. We also agree with other commenters that prematurely establishing a comprehensive list of safe harbor defenses may immunize covered entities against legitimate complaints or allegations, without commensurate reasons for doing so. We do, however, recognize that properly developed safe harbors may facilitate regulatory certainty and help focus our enforcement efforts in the future. Therefore, the Commission charges the CEDC with identifying, evaluating and making recommendations with respect to particular safe harbors, rebuttable presumptions or other similar bright-line guardrails distinguishing permissible from impermissible conduct under the rules we adopt today.

149. *Structured Complaint Process.* We decline at this time to adopt a structured formal complaint process for claims of digital discrimination of

access. In the *Notice*, we sought comment on whether the Commission should establish a structured complaint process similar to the formal complaint process of section 208 of the Communications Act. CTIA argues that the establishment of such a process would burden both staff at the Commission and the resources of covered entities. However, it is unnecessary for us to opine on these arguments. Instead, we agree with Verizon that, currently, the informal complaint process satisfies the requirements of section 60506 and provides the necessary functionality for the Commission to carry out its duties. Although some commenters encourage the Commission to establish a specific formal complaint process for digital discrimination of access claims, these commenters do not articulate the reasons for its necessity in light of the self-initiated investigatory approach the Commission adopts today. We do not foreclose the possibility of adopting a structured complaint process in the future, however. As the Commission gains experience investigating digital discrimination of access complaints, our approach may evolve, leading us to revisit this issue in the future.

150. As noted above, in order effectively to identify and combat potential violations of digital discrimination of access, the Enforcement Bureau will evaluate information provided to the Commission through the dedicated digital discrimination of access informal complaint pathway or through communications from state, local, or Tribal governments. The Enforcement Bureau, in coordination with the Consumer and Governmental Affairs Bureau, will review this information on a monthly basis and examine trends and geographic or demographic clusters, among other things, in the informal complaint filings to determine whether there is possible discrimination of access based on income level, race, ethnicity, color, religion, or national origin. Relevant evidence pertaining to purported differences in the covered elements of service will be especially probative. Where there is credible evidence suggesting that persons in a protected group were treated differently as the result of a policy or practice, the Enforcement Bureau, in its discretion, will use its authority to conduct investigations; issue Letters of Inquiry and subpoenas; conduct audits; inspect licenses and/or facilities; and collect information. Further, the Enforcement Bureau will use the full range of its enforcement options to enforce

compliance, including the possibility of forfeiture penalties.

151. *Voluntary Mediation of Digital Discrimination of Access Complaints.* As part of the monthly review process referenced in the preceding paragraph, Commission staff shall identify particular informal complaints that would be suitable candidates for a staff mediated resolution process. With regard to such complaints, prior to initiation of an Enforcement Bureau investigation, staff from the Bureau's Market Disputes Resolution Division (which has no involvement in Bureau-initiated investigations) may invite the informal complainant and the covered entity identified in the informal complaint to engage in a voluntary mediation process overseen by Division staff. If all parties are willing to engage in such voluntary mediation, the mediation would follow existing Commission procedures as outlined in Rule 1.737 insofar as practicable. Any resolution reached through such mediation process will be reduced to writing and will be binding only on the parties to the mediation. The parties to the mediation may agree, if they so choose, to disclose the terms of any resolution to the Enforcement Bureau's Investigations and Hearings Division, but will not be required to do so. If the parties choose to disclose the terms of the resolution to the Investigations and Hearings Division, the Enforcement Bureau will consider the terms and scope of the resolution in determining whether to initiate an investigation into the matters raised in the informal complaint. The Enforcement Bureau will not initiate such an investigation until the mediation process has concluded. This mediation process represents an alternative means of bringing speedy and effective resolution to disputes.

152. *Advisory Opinions.* In order to provide greater regulatory certainty and assist covered entities seeking to comply with our rules, we adopt a process to allow any such covered entity to seek an advisory opinion from Commission staff regarding the permissibility of a policy or practice affecting broadband access. The Commission adopted such an advisory opinion process in 2015 in connection with its open internet rules. We find today, as the Commission found in 2015, that an advisory opinion process will promote compliance and provide clarity, guidance, and predictability regarding our rules.

153. Under the process we adopt today, any covered entity may request an advisory opinion regarding the permissibility of its own policies and practices affecting access to broadband

internet access service. As noted in our rules, requests for an advisory opinion may be filed via the Commission's website or with the Office of the Secretary. Requests must be copied to the Chief of the Enforcement Bureau and the Chief of the Investigations and Hearings Division of the Enforcement Bureau. The Commission hereby delegates to the Enforcement Bureau the authority to receive such requests and issue such advisory opinions, and we direct the Enforcement Bureau to coordinate closely with other Bureaus and Offices regarding such advisory opinions. The Enforcement Bureau will have discretion to determine whether to issue an advisory opinion in response to a particular request or group of requests and will inform each requesting entity, in writing, whether the Bureau plans to issue an advisory opinion regarding the matter in question. The Enforcement Bureau shall decline to issue an advisory opinion if the relevant policy or practice is the subject of a pending government investigation or proceeding.

154. Covered entities may submit requests for advisory opinions regarding both current and prospective policies and practices affecting broadband access. However, a request must pertain to a policy or practice that the requesting party is currently utilizing or intends to utilize, rather than a mere possible or hypothetical scenario. And as a general matter, the Enforcement Bureau will prioritize responses regarding prospective policies and practices intended to ensure compliance with our rules. The Enforcement Bureau will also prioritize requests involving substantial questions with no clear Commission precedent and/or subject matter involving significant public interest.

155. When submitting requests, covered entities must include all material information such that Commission staff can make a fully informed determination on the matter. Requesting parties will also be required to certify that factual representations made to the Enforcement Bureau are truthful, accurate, and do not contain material omissions. The Enforcement Bureau will have discretion to request additional information from the requesting entity and from other parties that might have relevant information or be impacted by the request. These might include, for example, impacted consumers or state, local, or Tribal governments.

156. Our advisory opinion process will affect covered entities and the Commission's enforcement actions as described below. First, the process is fully voluntary. No covered entity will

be rewarded or penalized for seeking an advisory opinion, and the seeking (or not) of an advisory opinion will not itself influence any enforcement-related decision by the Commission. Second, in an advisory opinion, the Enforcement Bureau will issue a determination of whether or not the policy or practice detailed in the request complies with our rules implementing section 60506. If the Bureau determines that a policy or practice currently in effect violates our rules, it may provide in the opinion that it will not take enforcement action within a designated time period if the policy or practice is promptly corrected. Third, a requesting party may rely on an advisory opinion to the extent that its request fully and accurately describes all material facts and circumstances. Fourth, advisory opinions will be issued without prejudice to the Enforcement Bureau's or the Commission's ability to reconsider the questions involved, and rescind the opinion. Because advisory opinions would be issued by the Enforcement Bureau, they would also be issued without prejudice to the Commission's right to later rescind or revoke the findings. Should the Enforcement Bureau or Commission rescind a previously-issued advisory opinion, the requesting party must promptly discontinue use of the relevant policy or practice in order to remain in compliance with our rules.

157. The Enforcement Bureau will attempt to respond to requests for advisory opinions as efficiently as possible. We decline to establish firm deadlines, however, because we anticipate that the nature, complexity, and magnitude of requests might vary widely. Furthermore, it may take time for Commission staff to request any additional information needed to issue an opinion. Once issued, the Enforcement Bureau will make the advisory opinion available to the public. And to provide further guidance to industry and consumers, the Bureau will also release the initial request and any additional information deemed necessary to contextualize the opinion. Entities may request confidential treatment of certain information, as provided under Commission rules.

158. *Special Advisor for Equal Broadband Access.* As a further measure to provide assistance to stakeholders regarding the rules and new procedures we adopt today, the Commission shall designate a Special Advisor for Equal Broadband Access within the Wireline Competition Bureau to provide neutral technical assistance to all stakeholders. The Special Advisor will provide consumers and their representatives assistance with: understanding the

scope and substance of the rules; understanding the process for filing consumer complaints of digital discrimination of access; understanding what information may best assist the agency in fully assessing such complaints; identifying Commission resources that might be helpful to consumers in determining when digital discrimination of access might have occurred and how it can be challenged; addressing questions regarding the voluntary mediation of digital discrimination of access complaints; addressing questions regarding the advisory opinion process outlined above; and interfacing with various Commission components regarding access to broadband internet access service. The Special Advisor will likewise provide industry participants and their representatives assistance with: understanding the scope and substances of the rules; understanding the process for responding to complaints of digital discrimination of access; understanding what information may best assist the agency in fully assessing such responses; identifying Commission resources that might be helpful to industry participants in complying with the rules we adopt today; questions regarding the voluntary mediation of digital discrimination of access complaints; questions regarding seeking advisory opinions regarding policies or practices affecting access to broadband internet access service; and interfacing with various Commission components regarding access to broadband internet access service. The Special Advisor may be designated other responsibilities associated with the digital discrimination of access rules we adopt today and other matters relating to our efforts to ensure equal access to broadband internet access service.

159. *State and Local Enforcement and Private Rights of Action.* We decline at this time to authorize state and local enforcement of our rules, as some commenters urge. As explained above, the Commission is taking a self-initiated approach to investigations of digital discrimination of access. By doing so, the Commission can best establish the contours of what constitutes a violation of our prohibition in a consistent manner. We also decline at this time to create a private right of action, as we asked about in the *NPRM*, and thus find it unnecessary to opine at this time about our authority to do so.

*Differential Impact*

160. We find that in determining when consumers' access to broadband internet service is "differentially

impacted," whether intentionally or not, we must account for all comparable elements of service quality, terms and conditions. Consistent with our discussion above regarding the elements of service covered by our rules, we may compare service availability, service quality, and the terms and conditions of service as between different geographic areas and communities to determine whether digital discrimination of access has occurred. This may include all technical and non-technical aspects of service in a given area. We similarly provide ourselves the flexibility to consider any comparable geographic region that may be relevant to an alleged claim of digital discrimination of access. Finally, the data we use to determine when a policy or practice differentially impacts consumers' access to broadband service will encompass data both from within the Commission and from any outside sources that we consider relevant to evaluating the issues at hand. Contrary to the concerns expressed by some commenters, we do not expect that our digital discrimination of access rules will require covered entities to collect any new data from their customers in order to determine the differential impacts of their policies and practices. Covered entities should be able to make those determinations based solely on data from the U.S. Census Bureau.

161. We find this scope of inquiry necessary to meet section 60506's equal access goals. First, we agree with commenters that we must have a flexible and non-exhaustive approach to comparing broadband internet access service, as quality standards and the criteria to measure quality will change over time. Second, adopting a comprehensive approach is necessary to meet section 60506's aims regarding equal access because "a series of terms and conditions may have [cumulative effects on access] even when each may be only slightly onerous on its own." In other words, failing to have such a flexible approach could lead to our digital discrimination of access rules undermining Congress's intent for enacting section 60506 by "exacerbat[ing] digital discrimination [of access] rather than eliminating it." Finally, as the record reflects that digital discrimination of access requires assessing a myriad fact patterns, including various technological and non-technological aspects of broadband service, the unique challenges that covered entities face to deploy to certain areas, and that broadband use may vary within local communities, we must adopt a scope of comparability that can

holistically assess each claim. This analytical approach is consistent with the goal to ensure that "all people" benefit from broadband, including those in historically disadvantaged, Tribal, and rural communities. Our assessment of whether an "offered service" is of comparable quality to that available to other communities will turn on the *capabilities* of the service rather than the particular technology through which the service is offered. We will focus our analysis on whether the consumer has the equal opportunity to obtain and utilize broadband internet access service of comparable quality on comparable terms and conditions. In this regard, we are mindful that "comparable" does not mean "identical."

162. Our approach to comparability is consistent with established civil rights law. As explained, we will require that covered entities' policies and practices cause the identified disparities, consistent with the reasoning of *Inclusive Communities*. We disagree with T-Mobile that the "robust causality requirement simply is not workable in the broadband context[,]" as our flexible approach will allow to consider the factors that go into a provider's investment decisions. As these matters are so fact-driven, our inquiry will also be on a case-by-case basis, consistent both with longstanding precedent in civil rights law and our approach to determining feasibility.

163. We disagree with commenters asserting that a determination of digital discrimination of access need not require the "robust causality" outlined in *Inclusive Communities*. Some commenters argue that we should require only a showing of statistical disparity without any evidence that the challenged policies or practices caused the disparity. We disagree. Instead, we agree with those commenters asserting, consistent with *Inclusive Communities*, that sound disparate impact analysis requires a determination that the challenged policies and practices are a contributing cause of the identified differential in access.

*Comparing Technical Terms of Service*

164. We find that our flexible approach to comparability has several advantages when comparing the technical aspects of broadband. First, this approach is consistent with our definition of covered aspects of service. Second, this flexible approach will allow us to account for the "technical realities of provisioning" broadband when comparing technological aspects of services, such as network degradation and upgrades, by encompassing variables that can explain why network

performance may be better or worse during certain periods. Third, it will also provide for comparing technical aspects of service that are present in certain technologies and not others, such as wireless service. Finally, this approach will allow our comparability analysis to adapt as technological preferences change over time and account for substitutability.

165. The record in this proceeding regarding the "substitutability" (and therefore comparability) of broadband service provided through different technologies is mixed. While some commenters argue that the Commission's focus should be on whether the services are comparable in practical terms because section 60506 is "technology neutral," Public Knowledge cautions that "there are likely to be significant technical variations between different technologies (*e.g.*, wireline vs wireless), such that the default assumption should be that even with stated similarities a service that employs different technology is not comparable." Commenters also disagree on how substitutability should be considered with regard to emerging technologies, as some argue that service provided over fiber lacks a substitute and others suggest the opposite. The range of views on the record counsels that the Commission should take an approach to comparing technical aspects of service that can accommodate the unique considerations of each alleged instance of digital discrimination of access. The holistic and flexible approach to comparability and substitutability we describe today is consistent with that aim.

166. We decline to establish at this time a prescriptive range or standard for comparing technical aspects of service. We are not persuaded by commenters who suggest that we must take a prescriptive approach to comparing technical aspects of service because greater certainty is necessary to promote deployment. There are simply too many potentially relevant technical variables to each claim to suggest that a prescriptive approach could be practically administered or complied with. We agree with commenters that the varying technologies and services used to deliver broadband "have different natures and capabilities and should thus be evaluated independently using relevant performance metrics." Indeed, the court in *Orloff* itself pointed out that wireless carriers, even in a competitive market, still "cannot 'decline to serve any particular demographic group (*e.g.*, customers who are of a certain race or income bracket).'" The ability of wireless

carriers generally to provide sales concessions to some customers and not others without being held to have engaged in "unjust and unreasonable discrimination" within the meaning of sections 201 and 202 of the Communications Act does not mean that broadband providers may discriminate between customers on the basis of the characteristics protected by section 60506. Adding to this complexity, we acknowledge commenters' perspective that, while service interruptions may occasionally occur due to events such as network outages or network maintenance, significant or "chronic" network outages are red flags for possible digital discrimination of access. Our flexible approach will provide for these considerations while avoiding a situation where our technical comparability analysis becomes outdated, the range or scope of comparability becomes too broad or narrow, or our analysis is otherwise ill-suited for the service, service elements, or service terms being compared. We similarly disagree with commenters who assert that standards are necessary to ensure that our rules adequately protect consumers, as our flexible approach does so by "future proofing" our rules as standards change over time.

167. We decline to require network performance testing at this time. The record is mixed on the issue and such testing is not necessary to accomplish our immediate objectives, we find that adopting a network testing requirement at this time would be premature. While Public Knowledge argues we should adopt network testing requirements similar to those in the universal service context, USTelecom opposes network testing because it is "unjustified as a matter of law, unnecessary, and unduly burdensome."

*Comparing Non-Technical Terms of Service*

168. We find that our flexible approach to comparability likewise has several advantages for comparing non-technical elements of broadband service. First, this approach is consistent with the inclusive scope of our definition of covered elements of service. Second, this flexible approach allows us to assess holistically whether and how non-technical aspects of service may vary based on protected status. Third, allowing comparison of a broad range of services, service elements, and terms of service allows the Commission to evaluate non-technical terms of service across covered entities.

169. We decline to establish a prescriptive standard to compare non-technical aspects of service. Commenters suggest that the Commission should provide different comparability standards when comparing non-technical aspects of service offered by the same covered entity and non-technical aspects of service offered by different covered entities. Commenters also suggest that for services offered by the same covered entity, we should establish that all customer groups in the same area must have the opportunity to receive the same service on the same terms and conditions. Adopting this assumption, however, would not give proper weight to the feasibility analysis we adopt for claims of digital discrimination of access. We agree that "comparing across providers on non-technical factors is considerably more challenging" because "there are compelling competition reasons for different providers to have different terms of service or approaches to customer service." Nevertheless, our more flexible approach of considering all available information will allow the Commission to determine whether non-technical aspects of service across different covered entities in certain circumstances will provide useful evidence of reasonably available alternative practices.

*Geographic Comparability*

170. Section 60506(a)(2) defines "equal access" as the equal opportunity to subscribe to an offered service of comparable service "in a given area . . . ." Thus, when determining whether challenged policies and practices differentially impact access to broadband based on the listed characteristics, to the greatest extent possible, we must compare the service quality and terms and conditions of service in defined geographic areas that are appropriate and reasonably comparable in all respects other than the demographic characteristic(s) giving rise to the digital discrimination of access claim.

171. We find that we must adopt a broad and flexible approach to assess geographic comparability in this context. This is consistent with our approach to comparing technical and non-technical aspects of service. And, as Congress did not define "a given area" in section 60506(a)(2) nor anywhere else in the statute, we agree with commenters that we should determine the appropriate "given area" for an alleged instance of digital discrimination of access on a case-by-case basis. The record reflects a variety of suggestions and relevant

considerations for determining an appropriate geographic area for comparison of service quality and terms, providing that a flexible, case-by-case approach is both necessary and appropriate. First, commenters suggested a variety of geographic areas may be appropriate depending on the context, including the Nation as a whole, states, counties, metropolitan statistical areas, and census blocks, among others. Second, the record reflects that there are a variety of factors to consider to determine what area is appropriate to analyze a digital discrimination of access claim. For example, with respect to covered entities in particular, the record reflects that the geographic area that is appropriate may differ depending on the type of covered entity, such as a cable operator operating under a franchise agreement or an ILEC operating under a license area; the covered entity's size; or the type of broadband technology used to provide the service, such as fiber to the home or fixed wireless service. Third, though we find that we should compare similar geographic areas to assess claims of digital discrimination of access, the record also includes a variety of suggestions on how we should determine what the relevant geographic area is. For example, commenters suggest that we consider five factors to determine the correct area, while others generally suggest we use relevant geographic comparators, such as how close areas are to each other, changes in terrain, the cost of deployment, and whether the given area is rural or urban. As such, we will evaluate each claim holistically and determine what "given area" is appropriate based on the facts presented. Finally, our flexible, case-by-case approach to determining geographic comparability is consistent with our approach to determining feasibility. In both determinations, we adopt a flexible approach to account for the challenges of providing service to particular geographic areas, such as topography, population density, and other potential technical and economic barriers to providing broadband service.

172. We agree with Verizon that those filing digital discrimination of access complaints should, if possible, identify the given area where the alleged digital discrimination of access occurs. But given that many informal complaints may be filed by members of the public based on their own experiences with broadband access and have little or no information as to how widely their experiences might be shared by others, we will not require precision in this regard. If the informal complaint gives

the Commission enough information to determine the nature of the alleged violation and where the alleged violation occurred, that may be sufficient for the Commission to determine whether further inquiry is warranted. Moreover, we will not, as some have suggested, limit our investigations to the four corners of the informal complaint, examining only the policies and practices and the geographic areas identified therein. Rather, the informal complaint will be used as a starting point, a basis for determining whether to seek further information from the complainant, require a response from the covered entity involved, determine whether there are similar complaints forming a pattern, or take some other appropriate action. We understand that many of the comments suggesting that we apply strict "pleading" standards to complaints of digital discrimination of access are premised on the assumption (or possibility) that the Commission would adopt a formal complaint process akin to section 208 of the Communications Act and our rules implementing that section. As we have elected not to adopt such a formal complaint procedure at this time, we will provide maximum flexibility to persons filing informal complaints and will review such informal complaints as liberally and generously as possible to achieve the purposes of the statute as expeditiously as possible.

*Data To Analyze Differential Impact*

173. We will avail ourselves of all relevant Commission and external data collections to help us evaluate when access to broadband has been differentially impacted based on a protected characteristic. As in the record compiled in response to the *Notice of Inquiry*, commenters to the *NPRM* highlighted various studies and provided a robust debate as to whether the studies were well grounded and whether they agreed with their conclusions. For example, though some commenters continue to argue that certain studies remain convincing examples of digital discrimination of access, others argue that they downplay or ignore important facts or have been successfully rebutted. Commenters also cite a variety of other studies or sources of data as evidence that may help demonstrate or refute that digital discrimination of access actually exists. As the record is mixed and does not conclusively indicate that some sources of data are more robust or helpful than others, we will evaluate all data relevant to a claim of digital discrimination of access on a case-by-case basis, including

all Commission and external data sources and studies. Moreover, as to the existence (or not) of digital discrimination of access, we simply note that Congress directed the Commission to adopt rules on a short deadline to "prevent" and identify steps to "eliminate" digital discrimination of access. Arguments that such discrimination does not occur or does not exist should have been directed to Congress. The Commission's charge is to execute on the mandate we were given by Congress, and we intend to do that.

174. With particular respect to Commission data collections, the record reflects there could be many productive ways for us to use them both individually and in conjunction with other sources of data. Commenters suggest, for example, that we could analyze data from Commission broadband maps, broadband consumer labels, the Affordable Connectivity Program, the Lifeline program, or the Consumer Complaint Center to identify possible violations of our rules, identify possible subjects of investigation, or highlight existing disparities in deployment. Commission data collections coupled with data collected outside the Commission could also provide helpful insight. For example, comments advise that cross referencing and overlaying various data sets, using state broadband maps or Census Bureau information in conjunction with Commission maps, or comparing information submitted to the Commission, state, or local agencies with information a covered entity publishes regarding their service, could also help the Commission assess digital discrimination of access claims.

175. The Commission may also require new data collection in the future that could be helpful to analyzing comparability. As explained in the accompanying *Further Notice*, we propose to make new data available through an annual supplement to the BDC. Our proposed annual supplement would report (on a state-by-state basis) all major deployment, upgrade and maintenance projects completed or substantially completed in the preceding calendar year, including the nature and size of the project and identification of the communities served by the project, and could be useful to our comparability analysis if adopted. We also propose requiring covered entities to implement internal compliance programs that would require covered entities to identify the communities served by recently completed, pending and planned major projects, conduct comparability analysis, and identify whether relevant

policies and practices are differentially impacting consumers' access to broadband. This would require covered entities to conduct project evaluations, analyze their policies and practices, and conduct other internal monitoring and auditing that could help remove "invisible" impediments to equal broadband access.

176. We decline at this time to modify current Commission data collections or undertake new data collections. Various commenters suggest that we modify Commission data collections to aid our analysis of possible digital discrimination of access, such as by undertaking a new data collection under the Affordable Connectivity Program to allow for disaggregation of program participants by demographic group, or modifying broadband maps so consumers could more easily determine if they have "comparable" broadband service at their street address. Commenters also suggest we should collect new data to compare advertised and charged pricing. Since the Commission currently has at its disposal a number of data collections and potential data sources that may assist in our analysis of digital discrimination of access claims, it is unclear whether a new data collection's burdens would outweigh its potential benefits. As we gain greater experience investigating digital discrimination of access claims, we will evaluate the adequacy of current data collections and other data sources and will determine whether new data collections or modifications of existing data collections might be warranted. We note that commenters disagree as to the authority that broadband consumer labels provide for imposing a new BDC.

*Other Issues*

177. At this time, we decline to take action in the other policy areas identified in the record where there is possible intersection with the issues we address in this proceeding. In the *NPRM*, we invited comment on various record proposals, including potential action in different Commission proceedings, which could potentially help the Commission fulfill our statutory mandate. We received numerous proposals that address action we can take on Tribal lands, possible outreach efforts, and organizational changes we should make to promote our efforts to combat digital discrimination of access. In addition, commenters suggested further action related to broadband service in multiple tenant environments (MTEs), spectrum availability, spectrum policy, the Affordable Connectivity Program, other Commission funding programs, the

Commission's broadband speed benchmark, the BDC maps, and various suggestions that commenters argue would aid infrastructure deployment, such as revising the Commission's rules for small wireless facilities, pole attachments, section 214 discontinuances, and cable franchising, and addressing other local and federal regulatory barriers. The Commission's primary focus at this time is to implement effective rules to address digital discrimination of access within the deadline set by Congress. However, we will continue to consider the thoughtful proposals on the record that are not addressed in other sections of this *Report and Order* or in the *Further Notice.* Our decision to refrain from taking further steps today in those proposals does not reflect any policy or legal conclusions regarding these matters. Some commenters, in addition to advocating for the Commission to expand upon the listed characteristics Congress included in section 60506(b), ask that the Commission more broadly address concerns over exposure to radiofrequency energy. This topic is outside the scope of the current proceeding, and we refer commenters to the Commission's website for more information.

178. Although we are not adopting any other record proposals at this time, we note that states and localities can rely on several resources made available to them to address digital equity, such as the Infrastructure Act's broadband funding for states, the National Broadband Map, and the Broadband Funding Map. First, we recommend that states and localities tap in fully to the funding allocated to states and localities to address broadband equity. On June 26, 2023, NTIA announced how it allocated funding to all 50 states, the District of Columbia, and five U.S. territories to deploy affordable, reliable high-speed internet service to everyone in America. States and other jurisdictions will use funding from the Infrastructure Act's $42.45 billion Broadband Equity, Access, and Deployment (BEAD) program to administer grant programs within their borders. The BEAD funding will be used to deploy or upgrade broadband networks to ensure that everyone has access to reliable, affordable, high-speed internet service. Once deployment goals are met, any remaining funding can be used to pursue eligible access-, adoption-, and equity-related uses. We strongly encourage states and other jurisdictions to make full use of the available BEAD funding in order to expand broadband access in hard-to-

build areas, increase broadband affordability, and strengthen digital literacy within their respective borders. While these issues are distinct from digital discrimination of access as we have defined it, full utilization of BEAD funding might reduce the instances in which consumers believe they are experiencing digital discrimination of access and thus reduce the burdens on industry participants and the Commission in addressing digital discrimination of access claims.

179. Second, in addition to the CEDC recommendations discussed below, we recommend that states and localities utilize the National Broadband Map to identify unserved and underserved communities. We find, based on the record, that states and localities could benefit from available resources to help them identify unserved and underserved communities and develop solutions to address digital discrimination of access. The National Broadband Map displays where broadband internet services are and are not available across the country. The map is one step in an ongoing, iterative process that will involve the submission of data by providers, challenges from third parties and the public, and verifications and audits by the Commission. The maps produced through this process will continually improve and refine the broadband availability data relied upon by the Commission, other government agencies, and the public, as required by the Broadband DATA Act. An accurate map will help identify the unserved and underserved communities most in need of expanded access to broadband internet access service.

180. Third, we recommend that states and localities use the Broadband Funding Map to gain insight into the broadband infrastructure deployment projects funded by the Federal government throughout the United States and Territories. The Broadband Funding Map overlays the availability data reported on the National Broadband Map with the funding data to show locations receiving federal program support. Finally, we decline at this time to establish an Office of Civil Rights within the Commission, as several commenters have urged us to do. We recognize the potential benefits of establishing such an office, however, and therefore seek further focused comment in a *Further Notice.*

*State and Local Model Policies and Best Practices*

181. As proposed in the *NPRM,* we adopt as guidelines for states and localities the best practices to prevent

digital discrimination and promote digital equity recommended by the Communications Equity and Diversity Council (CEDC). Section 60506(d) of the Infrastructure Act directs the Commission to "develop model policies and best practices that can be adopted by states and localities to ensure that broadband internet access service providers do not engage in digital discrimination." To help fulfill this direction, in December 2021, Chairwoman Rosenworcel tasked the CEDC with issuing recommendations on the subjects specified in section 60506(d). In furtherance of that mission, the CEDC "took the lead in facilitating interviews, public events, and town hall meetings with multiple stakeholders, from community leaders to industry experts, state broadband directors, foundations, school district leaders, HBCUs, faith-based organizations, small-, minority-, and women-business owners, concerned citizens, and representatives of historically marginalized groups." The CEDC members "actively sought out the perspectives of the aforementioned groups and listened attentively to their experiences, challenges and aspirations." More specifically, the CEDC's Digital Empowerment and Inclusion (DEI) Working Group issued a report (the CEDC report) recommending both (1) model policies and best practices to prevent digital discrimination by broadband providers, and (2) best practices to advance digital equity for states and localities. On November 7, 2022, the members of the full CEDC voted unanimously in favor of adopting the report for submission to the Commission. We now adopt both sets of recommendations as guidelines for states and localities, in fulfillment of section 60506(d), while emphasizing that our action does not limit states and localities from taking additional steps to prevent and eliminate digital discrimination of access beyond those set forth in the CEDC report and adopted in this *Report and Order.*

182. As we explained in the *NPRM,* the six CEDC recommendations in its report "Model Policies and Best Practices to Prevent Digital Discrimination by ISPs" reflect the perspective of the industry, public interest stakeholders, local government representatives, and others. We conclude that adopting these consensus recommendations will be effective in addressing digital discrimination of access at the state and local level. Additionally, the thirteen recommendations in the report's "Best Practices to Advance Digital Equity for

State and Localities" reflect the consensus of industry and public interest stakeholders, and we find that they can serve as an effective framework for states and localities to advance digital equity.

183. We strongly encourage states and localities to implement these recommendations as a starting point, as we find that they can serve as an effective framework to advance digital equity. The record reflects widespread support for adopting both sets of recommendations. We agree with the Texas Coalition of Cities that the CEDC report's "Best Practices to Advance Digital Equity for State and Localities" recommendations appropriately focus on broadband and device programs, disseminate information and increase participation in federal broadband affordability programs, integrate existing social service supports with broadband services and create digital navigator programs where feasible. And as the U.S. Chamber of Commerce highlights, states and localities can adopt these model policies and practices at their discretion. Local Governments cautioned that while we should adopt the CEDC Report recommendations, we should also recognize the potential limits of states and local authorities to adopt those policies, in-part due to a lack of resources. While states and localities may still face potential limitations in implementing these recommendations, we envision that the aforementioned funding will be a good starting point for jurisdictions to begin taking the necessary steps to prevent and eliminate digital discrimination of access. Lastly, as noted by USTelecom, our approach affords us the opportunity to study the effects of implementation of those best practices by states and localities and determine whether further action on this front is warranted. We acknowledge that some states and localities may currently lack the necessary resources or authority to adopt and implement the CEDC report recommendations, but we note that the recommendations can be adopted and implemented at any time at the discretion of the governmental entity involved, such as when additional authority is provided or when additional resources are made available.

184. We disagree with arguments submitted by several commenters that we should refrain from adopting the recommendations in the CEDC report at this time in part due to the limited representation of local and state officials in the CEDC. We note that the CEDC's working group members did include some state and local representation and its Report was unanimously adopted. In

addition, the CEDC members were diligent in their research, and they interviewed several local and state officials to develop their recommendations. The members conducted more than 30 virtual interviews and relied upon data and research by scholars, organizations, and state and local governments that have driven digital equity and inclusion scholarship. The members also analyzed research publications and other publicly available documents issued by a variety of government agencies, academics and think tanks, and advocacy organizations to help inform their development of best practices and model policies to prevent digital discrimination and to promote digital equity. Among other sources, members reviewed federal guidance programs and broadband adoption initiatives, including partnerships between state and local governments and internet service providers in response to the pandemic. While we understand the concerns with the limited representation from state and local governments, we find unpersuasive assertions from some commenters that the recommendations from the CEDC report therefore should not be adopted on this basis. The methodology used to develop both sets of recommendations took into consideration the input and expertise from states and localities to better understand their experiences and lessons learned so that other jurisdictions might adopt and implement their successful strategies and methodologies and avoid their mistakes. We encourage state and local officials responsible for broadband expansion efforts to monitor the proceeding and engage with the rechartered CEDC.

**Procedural Matters**

185. *Regulatory Flexibility Act.* The Regulatory Flexibility Act of 1980, as amended (RFA), requires that an agency prepare a regulatory flexibility analysis for notice and comment rulemakings, unless the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." Accordingly, we have prepared a Final Regulatory Flexibility Analysis (FRFA) concerning the possible impact of the rule changes contained in this *Report and Order.*

186. *Paperwork Reduction Act.* This document contains new or modified information collection requirements subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104–13. All such new or modified information collection requirements will be

submitted to the Office of Management and Budget (OMB) for review under section 3507(d) of the PRA. OMB, the general public, and other Federal agencies will be invited to comment on the new or modified information collection requirements contained in this proceeding. In addition, we note that pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107–198, see 44 U.S.C. 3506(c)(4), we previously sought specific comment on how the Commission might further reduce the information collection burden for small business concerns with fewer than 25 employees. In this document, we describe several steps we have taken to minimize the information collection burdens on small entities.

187. *Congressional Review Act.* The Commission has determined, and the Administrator of the Office of Information and Regulatory Affairs, Office of Management and Budget, concurs, that this rule is major under the Congressional Review Act, 5 U.S.C. 804(2). The Commission will send a copy of this *Report and Order* to Congress and the Government Accountability Office pursuant to 5 U.S.C. 801(a)(1)(A).

188. *Contact Person.* For additional information on this proceeding, contact the Wireline Competition Bureau at *WCBDigDiscrimInfo@fcc.gov.*

**Ordering Clauses**

189. Accordingly, *it is ordered,* pursuant to sections 1, 2, 4(i) and (j), 303(r) of the Communications Act of 1934, as amended, 47 U.S.C. 151, 152, 154(i)–(j), 303(r), and section 60506 of the Infrastructure Investment and Jobs Act, Public Law 117–58, 135 Stat. 429, 1245–46 (2021), codified at 47 U.S.C. 1754, that this *Report and Order is adopted* and parts 0, 1, and 16 of the Commission's Rules, 47 CFR parts 0, 1, and 16 *are amended* as set forth in Appendix A. The *Report and Order* shall become effective 60 days after publication in the **Federal Register**, except that the amendments to 47 CFR 1.717, as amended in Appendix A, will not become effective until the Office of Management and Budget completes review of any information collection requirements in this *Report and Order* that the Wireline Competition Bureau determines is required under the Paperwork Reduction Act. The Commission directs the Wireline Competition Bureau to announce the effective date for 47 CFR 1.717 by subsequent Public Notice.

190. *It is further ordered* that the Commission's Office of the Secretary *shall send* a copy of this *Report and Order,* including the Final Regulatory

Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

191. *It is further ordered* that the Office of the Managing Director, Performance Program Management, *shall send* a copy of this *Report and Order* in a report to be sent to Congress and the Government Accountability Office pursuant to the Congressional Review Act, 5 U.S.C. 801(a)(1)(A).

### Final Regulatory Flexibility Analysis

Need for, and Objectives of, the "Second Report and Order"

192. The Report and Order takes an important step to promote equal access to broadband for all people in the United States by adopting rules pursuant to section 60506 of the Infrastructure Investment and Jobs Act (Infrastructure Act) that establish a balanced framework to facilitate equal access to broadband internet service by preventing digital discrimination of access. Many households in the United States lack equal access to broadband, with disparities that cross income, demographic, and geographic lines, including rural and tribal areas. Among households with broadband access, mid-sized communities, urban, and rural areas are all impacted by inferior service offerings. This *Report and Order* establishes that a policy or practice will violate the Commission's prohibition on digital discrimination of access if it discriminates based on one of section 60506's listed characteristics (either by intent or in effect), and creates a process to report incidents of digital discrimination and determine whether a violation has occurred.

193. First, the *Report and Order* defines "digital discrimination of access" as "Policies or practices, not justified by genuine issues of technical or economic feasibility, that (1) differentially impact consumers' access to broadband internet access service based on their income level, race, ethnicity, color, religion or national origin, or (2) are intended to have such differential impact." Second, the *Report and Order*, prohibits "digital discrimination of access." Third, it establishes the scope of covered entities, consumers, and services subject to the prohibition. Fourth, the *Report and Order* revises the Commission's informal consumer complaint process to: (1) add a dedicated pathway for digital discrimination of access complaints; (2) collect voluntary demographic information from filers who submit digital discrimination of access complaints; and (3) establish a clear pathway for organizations to

submit digital discrimination of access complaints. Fifth, it amends certain existing Commission enforcement rules: Rule 1.80, to reference the provisions of section 60506 in addition to those of the Communications Act and other statutes, and Rule 0.111 to reflect the Enforcement Bureau's direction to investigate claims of digital discrimination of access and make recommendations as to potential violations and penalties. Finally, the *Report and Order* adopts, as guidelines, the Communications Equity and Diversity Council's (CEDC's) model policies and best practices to prevent digital discrimination by broadband providers, and best practices to advance digital equity for states, localities, Tribal governments, and United States territories.

Summary of Significant Issues Raised by Public Comments in Response to the Initial Regulatory Flexibility Analysis (IRFA)

194. There were no comments filed that specifically addressed the proposed rules and policies presented in the IRFA or otherwise raised issues addressing the specific concerns of, and impact on small entities. Nonetheless, the Commission considered the potential impact of the rules proposed in the IRFA on small entities and took steps where appropriate and feasible to reduce the compliance burden for small entities in order to reduce the economic impact of the rules enacted herein on such entities.

Response to Comments by the Chief Counsel for Advocacy of the Small Business Administration

195. Pursuant to the Small Business Jobs Act of 2010, which amended the RFA, the Commission is required to respond to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA), and to provide a detailed statement of any change made to the proposed rules as a result of those comments. The Chief Counsel did not file any comments in response to the proposed rules in this proceeding.

Description and Estimate of the Number of Small Entities to Which the Rules Will Apply

196. The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the rules adopted herein. The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental

jurisdiction." In addition, the term "small business" has the same meaning as the term "small-business concern" under the Small Business Act. A "small-business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.

197. *Small Businesses, Small Organizations, Small Governmental Jurisdictions.* Our actions, over time, may affect small entities that are not easily categorized at present. We therefore describe, at the outset, three broad groups of small entities that could be directly affected herein. First, while there are industry specific size standards for small businesses that are used in the regulatory flexibility analysis, according to data from the Small Business Administration's (SBA) Office of Advocacy, in general a small business is an independent business having fewer than 500 employees. These types of small businesses represent 99.9% of all businesses in the United States, which translates to 32.5 million businesses.

198. Next, the type of small entity described as a "small organization" is generally "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field." The Internal Revenue Service (IRS) uses a revenue benchmark of $50,000 or less to delineate its annual electronic filing requirements for small exempt organizations. Nationwide, for tax year 2020, there were approximately 447,689 small exempt organizations in the U.S. reporting revenues of $50,000 or less according to the registration and tax data for exempt organizations available from the IRS.

199. Finally, the small entity described as a "small governmental jurisdiction" is defined generally as "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand." U.S. Census Bureau data from the 2017 Census of Governments indicate there were 90,075 local governmental jurisdictions consisting of general purpose governments and special purpose governments in the United States. Of this number there were 36,931 general purpose governments (county, municipal and town or township) with populations of less than 50,000 and 12,040 special purpose governments—independent school districts with enrollment populations of less than 50,000. Accordingly, based on the 2017 U.S. Census of Governments data, we estimate that at least 48,971 entities fall

into the category of "small governmental jurisdictions."

200. *Wired Telecommunications Carriers.* The U.S. Census Bureau defines this industry as establishments primarily engaged in operating and/or providing access to transmission facilities and infrastructure that they own and/or lease for the transmission of voice, data, text, sound, and video using wired communications networks. Transmission facilities may be based on a single technology or a combination of technologies. Establishments in this industry use the wired telecommunications network facilities that they operate to provide a variety of services, such as wired telephony services, including VoIP services, wired (cable) audio and video programming distribution, and wired broadband internet services. By exception, establishments providing satellite television distribution services using facilities and infrastructure that they operate are included in this industry. Wired Telecommunications Carriers are also referred to as wireline carriers or fixed local service providers.

201. The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small. U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year. Of this number, 2,964 firms operated with fewer than 250 employees. Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 4,590 providers that reported they were engaged in the provision of fixed local services. Of these providers, the Commission estimates that 4,146 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

202. *Local Exchange Carriers (LECs).* Neither the Commission nor the SBA has developed a size standard for small businesses specifically applicable to local exchange services. Providers of these services include both incumbent and competitive local exchange service providers. Wired Telecommunications Carriers is the closest industry with an SBA small business size standard. Wired Telecommunications Carriers are also referred to as wireline carriers or fixed local service providers. The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small. U.S. Census Bureau data for 2017 show that there were 3,054 firms

that operated in this industry for the entire year. Of this number, 2,964 firms operated with fewer than 250 employees. Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 4,590 providers that reported they were fixed local exchange service providers. Of these providers, the Commission estimates that 4,146 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

203. *Competitive Local Exchange Carriers (LECs).* Neither the Commission nor the SBA has developed a size standard for small businesses specifically applicable to local exchange services. Providers of these services include several types of competitive local exchange service providers. Wired Telecommunications Carriers is the closest industry with an SBA small business size standard. The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small. U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year. Of this number, 2,964 firms operated with fewer than 250 employees. Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 3,378 providers that reported they were competitive local exchange service providers. Of these providers, the Commission estimates that 3,230 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

204. *Interexchange Carriers (IXCs).* Neither the Commission nor the SBA has developed a small business size standard specifically for Interexchange Carriers. Wired Telecommunications Carriers is the closest industry with an SBA small business size standard. The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small. U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year. Of this number, 2,964 firms operated with fewer than 250 employees. Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 127 providers that reported they were engaged in the provision of

interexchange services. Of these providers, the Commission estimates that 109 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, the Commission estimates that the majority of providers in this industry can be considered small entities.

205. *Cable System Operators (Telecom Act Standard).* The Communications Act of 1934, as amended, contains a size standard for a "small cable operator," which is "a cable operator that, directly or through an affiliate, serves in the aggregate fewer than one percent of all subscribers in the United States and is not affiliated with any entity or entities whose gross annual revenues in the aggregate exceed $250,000,000." For purposes of the Telecom Act Standard, the Commission determined that a cable system operator that serves fewer than 677,000 subscribers, either directly or through affiliates, will meet the definition of a small cable operator based on the cable subscriber count established in a 2001 Public Notice. Based on industry data, only six cable system operators have more than 677,000 subscribers. Accordingly, the Commission estimates that the majority of cable system operators are small under this size standard. We note however, that the Commission neither requests nor collects information on whether cable system operators are affiliated with entities whose gross annual revenues exceed $250 million. Therefore, we are unable at this time to estimate with greater precision the number of cable system operators that would qualify as small cable operators under the definition in the Communications Act.

206. *Other Toll Carriers.* Neither the Commission nor the SBA has developed a definition for small businesses specifically applicable to Other Toll Carriers. This category includes toll carriers that do not fall within the categories of interexchange carriers, operator service providers, prepaid calling card providers, satellite service carriers, or toll resellers. Wired Telecommunications Carriers is the closest industry with a SBA small business size standard. The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small. U.S. Census Bureau data for 2017 show that there were 3,054 firms in this industry that operated for the entire year. Of this number, 2,964 firms operated with fewer than 250 employees. Additionally, based on Commission data in the 2021 Universal Service Monitoring Report, as of December 31, 2020, there were 115

providers that reported they were engaged in the provision of other toll services. Of these providers, the Commission estimates that 113 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

207. *Wireless Telecommunications Carriers (except Satellite).* This industry comprises establishments engaged in operating and maintaining switching and transmission facilities to provide communications via the airwaves. Establishments in this industry have spectrum licenses and provide services using that spectrum, such as cellular services, paging services, wireless internet access, and wireless video services. The SBA size standard for this industry classifies a business as small if it has 1,500 or fewer employees. U.S. Census Bureau data for 2017 show that there were 2,893 firms in this industry that operated for the entire year. Of that number, 2,837 firms employed fewer than 250 employees. Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 594 providers that reported they were engaged in the provision of wireless services. Of these providers, the Commission estimates that 511 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

208. *Satellite Telecommunications.* This industry comprises firms "primarily engaged in providing telecommunications services to other establishments in the telecommunications and broadcasting industries by forwarding and receiving communications signals via a system of satellites or reselling satellite telecommunications." Satellite telecommunications service providers include satellite and earth station operators. The SBA small business size standard for this industry classifies a business with $38.5 million or less in annual receipts as small. U.S. Census Bureau data for 2017 show that 275 firms in this industry operated for the entire year. Of this number, 242 firms had revenue of less than $25 million. Additionally, based on Commission data in the 2021 Universal Service Monitoring Report, as of December 31, 2020, there were 71 providers that reported they were engaged in the provision of satellite telecommunications services. Of these providers, the Commission estimates that approximately 48 providers have

1,500 or fewer employees. Consequently, using the SBA's small business size standard, a little more than of these providers can be considered small entities.

209. *Local Resellers.* Neither the Commission nor the SBA have developed a small business size standard specifically for Local Resellers. Telecommunications Resellers is the closest industry with a SBA small business size standard. The Telecommunications Resellers industry comprises establishments engaged in purchasing access and network capacity from owners and operators of telecommunications networks and reselling wired and wireless telecommunications services (except satellite) to businesses and households. Establishments in this industry resell telecommunications; they do not operate transmission facilities and infrastructure. Mobile virtual network operators (MVNOs) are included in this industry. The SBA small business size standard for Telecommunications Resellers classifies a business as small if it has 1,500 or fewer employees. U.S. Census Bureau data for 2017 show that 1,386 firms in this industry provided resale services for the entire year. Of that number, 1,375 firms operated with fewer than 250 employees. Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 207 providers that reported they were engaged in the provision of local resale services. Of these providers, the Commission estimates that 202 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

210. *Toll Resellers.* Neither the Commission nor the SBA have developed a small business size standard specifically for Toll Resellers. Telecommunications Resellers is the closest industry with an SBA small business size standard. The Telecommunications Resellers industry comprises establishments engaged in purchasing access and network capacity from owners and operators of telecommunications networks and reselling wired and wireless telecommunications services (except satellite) to businesses and households. Establishments in this industry resell telecommunications; they do not operate transmission facilities and infrastructure. Mobile virtual network operators (MVNOs) are included in this industry. The SBA small business size standard for Telecommunications Resellers classifies a business as small if

it has 1,500 or fewer employees. U.S. Census Bureau data for 2017 show that 1,386 firms in this industry provided resale services for the entire year. Of that number, 1,375 firms operated with fewer than 250 employees. Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 457 providers that reported they were engaged in the provision of toll services. Of these providers, the Commission estimates that 438 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

211. *All Other Telecommunications.* This industry is comprised of establishments primarily engaged in providing specialized telecommunications services, such as satellite tracking, communications telemetry, and radar station operation. This industry also includes establishments primarily engaged in providing satellite terminal stations and associated facilities connected with one or more terrestrial systems and capable of transmitting telecommunications to, and receiving telecommunications from, satellite systems. Providers of internet services (e.g., dial-up ISPs) or voice over internet protocol (VoIP) services, via client supplied telecommunications connections are also included in this industry. The SBA small business size standard for this industry classifies firms with annual receipts of $35 million or less as small. U.S. Census Bureau data for 2017 show that there were 1,079 firms in this industry that operated for the entire year. Of those firms, 1,039 had revenue of less than $25 million. Based on this data, the Commission estimates that the majority of "All Other Telecommunications" firms can be considered small.

*Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities*

212. The *Report and Order* adopts rules defining digital discrimination making it unlawful for any broadband provider or covered entity to adopt, implement or utilize policies or practices, not justified by genuine issues of technical or economic feasibility, that differentially impact consumers' access to broadband internet access service based on their income level, race, ethnicity, color, religion, or national origin or are intenced to have such differential impact. When investigating claims of digital discrimination, small entities will need to gather and provide information needed by the Commission

to assess claims of technical or economic feasibility, and prove by a preponderance of the evidence that the policy or practice in question is justified by genuine issues of technical or economic feasibility. This may involve additional staff time, possibly by engineering and accounting professionals that can speak to technical or economic issues.

213. In reviewing the record, commenters expressed concern about obstacles faced by small providers. However, we adopt a flexible approach to assessing the technical and economic feasibility of a covered entity's practices, and will review alleged digital discrimination of access on a case-by-case basis. The Commission does not have sufficient information on the record to quantify the cost of compliance for small entities. The Commission, however, anticipates the approaches it has taken to implement the requirements will have minimal implications because its approach to investigations accounts for variations among provider types and industry, and will tailor its interactions with such small entities to account for these burdens.

*Steps Taken To Minimize the Significant Economic Impact on Small Entities, and Significant Alternatives Considered*

214. The RFA requires an agency to provide "a description of the steps the agency has taken to minimize the significant economic impact on small entities . . . including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected."

215. The *Report and Order* establishes a balanced framework to facilitate equal access to broadband internet service by preventing digital discrimination of access to that service. These rules adopted in the *Report and Order* address business practices and policies that impede equal access to broadband, take into account issues of technical and economic feasibility that pose serious challenges to full achievement of the equal access objective, and consider impacts on small entities. The Commission considered small business interests in including "genuine issues of technical or economic feasibility" in the definition of "digital discrimination of access." The Commission also acknowledged that the technical and economic challenges that providers face in deploying and serving rural and

urban areas can vary greatly. The Commission's approach to technical and economic feasibility accounts for variations among provider types and industries. Moreover, the CEDC conducted outreach to small-, minority-, and women- businesses in developing the model policies and best practices to prevent digital discrimination of access adopted by the *Report and Order*.

216. In reaching its final conclusions in this proceeding, the Commission considered a number of alternatives, such as addressing digital discrimination of access issues raised either in other proceedings, or in the current record, that could potentially impact small businesses. For example, we considered whether to establish an Office of Civil Rights within the Commission, as several commenters have urged us to do, however we will make this assessment outside the scope of this proceeding as a matter of internal structure, organization, and staffing. Additionally, the Commission determined that, at this time, its primary focus is to implement effective rules to address digital discrimination of access by the statutory deadline set by Congress, but will continue to consider the thoughtful proposals not addressed in other sections of the *Report and Order*. We also considered proposals to modify current Commission data collections to accept new data or otherwise undertake new data collections. However, it is currently unclear whether a new data collection's burdens would outweigh its potential benefits, because the Commission has access to a number of data collections and potential data sources that may assist in our analysis of digital discrimination of access claims.

217. We considered additional alternatives that may impact small entities, including how we define terms used in our digital discrimination analysis. For example, we declined to adopt specific standards or definitions for different types of providers because we want these rules to maintain the flexibility needed to address providers of various sizes, difference technologies, and the unique circumstances of each covered entity, including small businesses. We also declined proposals to define digital discrimination in a manner that considers differences in the profitability of serving one area over another, because we weigh profitability separately from technical or economic feasibility. We did not include issues pertaining to personal data that is processed by an algorithm in the definition of digital discrimination because section 60506 is not directly related to those concerns. To eliminate

potential loopholes in complying with these rules, we retain the term "genuine" as part of our definition of digital discrimination to ensure that covered entities cannot rely upon unsupported assertions of technical or economic feasibility to refute claims of digital discrimination of access.

*Report to Congress*

218. The Commission will send a copy of the *Report and Order*, including this FRFA, in a report to Congress pursuant to the Congressional Review Act.[3] In addition, the Commission will send a copy of the *Report and Order*, including this FRFA, to the Chief Counsel for Advocacy of the Small Business Administration. A copy of the *Report and Order* and FRFA (or summaries thereof) will also be published in the **Federal Register**.

**List of Subjects in 47 CFR Parts 0, 1, and 16**

Communications, Telecommunications, Organizations and Functions, Equal Access to Justice, Investigations, Penalties, Digital Discrimination, Equal access.

Federal Communications Commission.

**Marlene Dortch,**

*Secretary.*

**Final Rules**

For the reasons discussed in the preamble, the Federal Communications Commission amends 47 CFR parts 0, 1, and 16 as follows:

**PART 0—COMMISSION ORGANIZATION**

■ 1. Effective March 22, 2024, the authority citation for part 0 is revised to read as follows:

**Authority:** 47 U.S.C. 151, 154(i), 154(j), 155, 225, 409, and 1754, unless otherwise noted.

■ 2. Effective March 22, 2024, amend § 0.111 by adding paragraph (a)(30) to read as follows:

**§ 0.111  Functions of the Bureau.**

(a) * * *

(30) Resolve complaints alleging violations of digital discrimination of access pursuant to 47 CFR part 16.

*   *   *   *   *

**PART 1—PRACTICE AND PROCEDURE**

■ 3. Effective March 22, 2024, the authority citation for part 1 is revised to read as follows:

---

[3] *Id.* section 801(a)(1)(A).

**Authority:** 47 U.S.C. css. 2, 5, 9, 13; 28 U.S.C. 2461 note; 47 U.S.C. 1754, unless otherwise noted.

■ 4. Effective March 22, 2024, amend § 1.80 by adding paragraph (u)(8) to read as follows:

### § 1.80   Forfeiture proceedings.

(u) * * *

(8) Violated section 60506 of the Infrastructure and Jobs Act of 2021 or 47 CFR part 16.

* * * * *

■ 5. Delayed indefinitely, amend § 1.717 by adding ", except for digital discrimination of access informal complaints filed pursuant to 47 CFR part 16" after "in accordance with § 1.721" and before the period in the last sentence and by adding a new last sentence.

The addition reads as follows:

### § 1.717   Procedure.

* * * In addition, for the purpose of informal complaints submitted under 47 CFR part 16, the Commission's informal complaint procedures will apply to all covered entities as defined in 47 CFR 16.2.

■ 6. Effective March 22, 2024, add part 16 to read as follows:

## PART 16—DIGITAL DISCRIMINATION OF ACCESS

Sec.
16.1   Purpose.
16.2   Definitions.
16.3   Digital discrimination of access prohibited.
16.4   Findings of discrimination.
16.5   Technical and economic feasibility.
16.6   Enforcement.
16.7   Advisory opinions.

**Authority:** 47 U.S.C. 1754, unless otherwise noted.

### § 16.1   Purpose.

The purpose of this part is to implement section 60506 of the Infrastructure Investment and Jobs Act, 135 Stat. 429 (2021) (Infrastructure Act) that requires the Commission to adopt rules to facilitate equal access to broadband internet access service, taking into account the issues of technical and economic feasibility presented by that objective, including:

(a) Preventing digital discrimination of access based on income level, race, ethnicity, color, religion, or national origin; and

(b) Identifying necessary steps for the Commission to take to eliminate discrimination described in this part.

### § 16.2   Definitions.

*Broadband internet access service* is defined by § 8.1(b) of this subchapter.

*Broadband provider* is defined by § 54.1600(b) of this chapter.

*Consumer* includes current and potential subscribers, individual persons, groups of persons, individual organizations, and groups of organizations having the capacity to subscribe to and receive broadband internet access service.

*Covered entity* includes broadband internet access service providers and entities that provide services that facilitate and affect consumer access to broadband internet access service, including but not limited to:

(1) Broadband internet access service providers;

(2) Contractors retained by, or entities working through partnership agreements or other business arrangements with, broadband internet access service providers;

(3) Entities facilitating or involved in the provision of broadband internet access service;

(4) Entities maintaining and upgrading network infrastructure; and,

(5) Entities that otherwise affect consumer access to broadband internet access service.

*Covered elements of service* is defined as any components of service quality or terms and conditions on which broadband internet access service is provided. The definition includes, but is not limited to:

(1) Deployment of broadband infrastructure, network upgrades, and network maintenance;

(2) Service quality components and the terms and conditions on which broadband internet access service is provided, including but not limited to speeds, capacities, latency, data caps, throttling, pricing, promotional rates, imposition of late fees, opportunity for equipment rental, installation time, contract renewal terms, service termination terms, and use of customer credit and account history;

(3) Marketing, advertisement, and outreach; and

(4) Technical service, onsite service, and other provision of customer service.

*Covered services* is defined as broadband internet access service by § 8.1(b) of this subchapter.

*Digital discrimination of access* means policies or practices, not justified by genuine issues of technical or economic feasibility, that differentially impact consumers' access to broadband internet access service based on their income level, race, ethnicity, color, religion, or national origin or are intended to have such differential impact.

*Economically feasible* means reasonably achievable as evidenced by

prior success by covered entities under similar circumstances or demonstrated new economic conditions clearly indicating that the policy or practice in question may reasonably be adopted, implemented, and utilized.

*Equal access* means the opportunity to subscribe to an offered service that provides comparable speeds, capacity, latency, and other quality of service metrics in a given area, for comparable terms and conditions.

*Subscriber* is defined as a subscriber to broadband internet access service as defined as in § 8.1(b) of this subchapter.

*Technically feasible* means reasonably achievable as evidenced by prior success by covered entities under similar circumstances or demonstrated technological advances clearly indicating that the policy or practice in question may reasonably be adopted, implemented, and utilized.

### § 16.3   Digital discrimination of access prohibited.

(a) This section provides the Commission's interpretation of actions that constitute digital discrimination of access under 47 U.S.C. 1754.

(b) It shall be unlawful for any broadband provider, or covered entity as described in this part, to adopt, implement or utilize policies or practices, not justified by genuine issues of technical or economic feasibility, that differentially impact consumers' access to broadband internet access service based on their income level, race, ethnicity, color, religion, or national origin or are intended to have such differential impact.

### § 16.4   Findings of discrimination.

(a) *Discriminatory treatment.* The Commission may find that a covered entity engaged in intentional discrimination by direct evidence or circumstantial evidence that the covered entity's policy or practice was adopted, implemented, or utilized with the intent to differentially impact consumers' access to covered services or covered elements of service on one or more of the bases listed in section 60506(b) of the Infrastructure Act.

(b) *Discriminatory effect.* The Commission may find that a covered entity adopted, implemented, or utilized a policy or practice that had a discriminatory effect on one or more of the bases listed in section 60506(b) of the Infrastructure Act. A discriminatory effect occurs when a facially neutral policy or practice differentially impacts consumers' access to covered services or covered elements of service.

### § 16.5   Technical and economic feasibility.

(a) Where the Commission determines that a covered entity's policy or practice is motivated by discriminatory intent on the basis of income level, race, ethnicity, color, religion, or national origin, the entity will not be found liable for digital discrimination of access if the policy or practice is justified by genuine issues of technical or economic feasibility.

(b) Where the Commission determines that a covered entity's policy or practice has discriminatory effects on the basis of income level, race, ethnicity, color, religion, or national origin, the entity will not be found liable for digital discrimination of access if the policy or practice is justified by genuine issues of technical or economic feasibility.

(c) Covered entities have the burden of proving to the Commission that a policy or practice under investigation is justified by genuine issues of technical or economic feasibility. This may include proof that available, less discriminatory alternatives were not reasonably achievable at the time the policy or practice was adopted, implemented, or utilized because of genuine technical or economic constraints.

(d) Genuine issues of technical or economic feasibility must be demonstrated by a preponderance of the evidence, with the covered entity providing the Commission all of the empirical evidence and documentation needed to substantiate the technical or economic justifications for the policy or practice under investigation.

(e) The Commission will determine on a case-by-case basis whether genuine issues of technical or economic feasibility justified the adoption, implementation, or utilization of a policy or practice that was motivated by discriminatory intent on the basis of income level, race, ethnicity, color, religion, or national origin, or that caused discriminatory effects on one or more of these bases.

### § 16.6   Enforcement.

Any allegation that a covered entity has violated the regulations in this part may be referred to the Commission's Enforcement Bureau.

### § 16.7   Advisory opinions.

(a) *Procedures.* (1) Any entity that is subject to the Commission's rules implementing section 60506 of the Infrastructure Act may request an advisory opinion from the Enforcement Bureau regarding the permissibility of its own policies and practices affecting access to broadband internet access service. Requests for advisory opinions

may be filed via the Commission's website or with the Office of the Secretary and must be copied to the Chief of the Enforcement Bureau and the Chief of the Investigations and Hearings Division of the Enforcement Bureau.

(2) The Enforcement Bureau may, in its discretion, determine whether to issue an advisory opinion in response to a particular request or group of requests and will inform each requesting entity, in writing, whether the Bureau plans to issue an advisory opinion regarding the matter in question.

(3) Requests for advisory opinions must relate to a current or proposed policy or practice that the requesting party intends to pursue. The Enforcement Bureau will not respond to requests if the same or substantially the same conduct is the subject of a current government investigation or proceeding, including any ongoing litigation or open rulemaking at the Commission.

(4) Requests for advisory opinions must be accompanied by all material information sufficient for Enforcement Bureau staff to make a determination on the proposed conduct for which review is requested. Requesters must certify that factual representations made to the Bureau are truthful and accurate, and that they have not intentionally omitted any information from the request. A request for an advisory opinion that is submitted by a business entity or an organization must be executed by an individual who is authorized to act on behalf of that entity or organization.

(5) Enforcement Bureau staff will have discretion to ask parties requesting opinions, as well as other parties that may have information relevant to the request or that may be impacted by the proposed conduct, for additional information that the staff deems necessary to respond to the request. Such additional information, if furnished orally or during an in-person conference with Bureau staff, shall be promptly confirmed in writing. Parties are not obligated to respond to staff inquiries related to advisory opinions. If a requesting party fails to respond to a staff inquiry, then the Bureau may dismiss that party's request for an advisory opinion. If a party voluntarily responds to a staff inquiry for additional information, then it must do so by a deadline to be specified by Bureau staff. Advisory opinions will expressly state that they rely on the representations made by the requesting party, and that they are premised on the specific facts and representations in the request and any supplemental submissions.

(b) *Response.* After review of a request submitted hereunder, the Enforcement Bureau will:

(1) Issue an advisory opinion that will state the Bureau's determination as to whether or not the policy or practice detailed in the request complies with the Commission's rules implementing section 60506 of the Infrastructure Act;

(2) Issue a written statement declining to respond to the request; or

(3) Take such other position or action as it considers appropriate. An advisory opinion states only the enforcement intention of the Enforcement Bureau as of the date of the opinion, and it is not binding on any party. Advisory opinions will be issued without prejudice to the Enforcement Bureau, or the Commission to reconsider the questions involved, or to rescind or revoke the opinion. Advisory opinions will not be subject to appeal or further review.

(c) *Enforcement effect.* The Enforcement Bureau will have discretion to indicate the Bureau's lack of enforcement intent in an advisory opinion based on the facts, representations, and warranties made by the requesting party. If the Bureau determines that a policy or practice currently in effect violates Commission rules, it may provide in the opinion that it will not take enforcement action within a designated time period if the policy or practice is promptly corrected. The requesting party may rely on the opinion only to the extent that the request fully and accurately contains all the material facts and circumstances. Should the Bureau or Commission rescind a previously issued advisory opinion, the requesting party must promptly discontinue use of the relevant policy or practice in order to remain in compliance with our rules.

(d) *Public disclosure.* The Enforcement Bureau will make advisory opinions available to the public on the Commission's website. The Bureau will also publish the initial request for guidance and any associated materials. Parties soliciting advisory opinions may request confidential treatment of information submitted in connection with a request for an advisory opinion pursuant to § 0.459 of this subchapter.

(e) *Withdrawal of request.* Any requesting party may withdraw a request for review at any time prior to receipt of notice that the Enforcement Bureau intends to issue an adverse opinion, or the issuance of an opinion. The Enforcement Bureau remains free, however, to submit comments to such requesting party as it deems appropriate. Failure to take action after receipt of documents or information,

whether submitted pursuant to this procedure or otherwise, does not in any way limit or stop the Bureau from taking such action at such time thereafter as it deems appropriate. The Bureau reserves the right to retain documents submitted to it under this procedure or otherwise and to use them for all governmental purposes.

[FR Doc. 2023–28535 Filed 1–19–24; 8:45 am]

**BILLING CODE 6712–01–P**